279 N.J. Super. 74 (1995)
652 A.2d 212
IN THE MATTER OF CROWN/VISTA ENERGY PROJECT, BOILER STACK NO. 1, LOG XX-XX-XXXX.
Superior Court of New Jersey, Appellate Division.
Argued November 10, 1994.
Decided January 25, 1995.
*77 Before Judges SHEBELL, SKILLMAN and WALLACE.
Timothy S. Haley argued the cause for appellants, Delaware Valley Concerned Citizens, Diane Burke and Elizabeth Crane (Mr. Haley, on the brief).
Paul H. Schneider argued the cause for respondent, Crown/Vista Energy Project (Giordano, Halleran and Ciesla, attorneys; George J. Tyler, of counsel; Mr. Schneider, Jody V. Wilson and Robert J. Blackwell, on the brief).
Alyssa L. Pearlman, Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environment Protection (Deborah T. Poritz, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Pearlman, on the brief).
PER CURIAM.
Appellants Delaware Valley Concerned Citizens, Diane Burke and Elizabeth Crane appeal from an order of the Department of Environmental Protection (DEP) issuing an air pollution control permit to respondent Crown/Vista Energy Project. Respondent intends to construct a 362 megawatt coal-fueled power plant in West Deptford, New Jersey for the sale of electricity to Jersey Central Power and Light (JCP & L) and others. On February 28, 1992, respondent submitted an application for a state air pollution control permit and on October 1, 1993, DEP issued an air pollution control permit. Appellants contend on appeal that: (1) the permit does not comply with the Clean Air Act (Act) Amendments of 1990; (2) the DEP regulations do not establish any criteria or standards for determining when an application is complete; (3) there is no evidence in the record to support DEP's determination *78 of the quantity of emissions of volatile organic compounds (VOC); and (4) respondent failed to obtain a certificate of need pursuant to the Electric Facility Need Assessment Act (EFNA). We affirm.
Respondent proposed to construct a large, complex independent producing facility consisting of two 1789 million BTU per hour heat input boilers; two 181 megawatt capacity steam-turbo generator sets; a track hopper; a crusher house; a coal yard storage enclosure; two coal silos; two recycle ash silos; two disposal ash silos; two submerged chain conveyors; two lime storage silos; a lime car unloading station; two cooling towers; two ammonia storage tanks; two ammonia removal towers; an inactive coal pile; a car thaw shed; two disposal ash vacuum pumps; and associated auxiliary equipment needed to operate the facility. The facility will have the capacity to generate approximately 2.59 million pounds of steam per hour, and will produce 362 megawatts of electrical power to be sold to JCP & L and other nearby users. The fuels to be used at the facility will be coal containing a maximum of 1.7% sulfur, with natural gas used for start up only. The facility will have a single 450 foot stack and will be located at a site on Paradise Road in West Deptford Township, Gloucester County.
The facility will have several air pollution control devices installed. These include: advanced combustion controls, including a selective catalytic reduction system with ammonia injection, to minimize carbon monoxide and nitrogen oxide emissions; and a flue gas desulfurization system to remove sulfur dioxide from the burning coal with a minimum efficiency of 93%, which will also remove particulate matter formed during the coal combustion process. A baghouse, which is designed to remove at least 99.6% of the particulate in the flue gas, will be installed for each boiler. DEP determined that the proposed air pollution control devices represent the best available control technology (BACT) for a pulverized coal boiler facility.
*79 On February 28, 1992, respondent submitted an application for a state air pollution control permit.[1] On October 21, 1992, DEP declared the application to be complete for the purpose of commencing technical review. On March 4, 1993, DEP issued a draft permit to respondent. The public comment period ran from March 11, 1993, until April 21, 1993. A public hearing was held on April 13, 1993. On October 1, 1993, DEP issued an air pollution control permit. On the same date, DEP issued its written response to the comments received from the public as well as a hearing officer's report. This appeal followed.
The scope of judicial review of an administrative agency's decision is narrowly limited. In reviewing decisions of administrative agencies "a presumption of reasonableness attaches to the actions of an administrative agency...." Smith v. Ricci, 89 N.J. 514, 525, 446 A.2d 501 (citation omitted), appeal dismissed sub nom. Smith v. Brandt, 459 U.S. 962, 103 S.Ct. 286, 74 L.Ed.2d 272 (1982). We will not overturn the decision of an administrative agency unless it is arbitrary, capricious, or unreasonable or is not supported by substantial credible evidence in the record. See Henry v. Rahway State Prison, 81 N.J. 571, 579-80, 410 A.2d 686 (1980). Further, we are not to usurp administrative policy decisions or to substitute our judgment for that of the agency. See Texter v. Dep't of Human Services, 88 N.J. 376, 382, 443 A.2d 178 (1982). Of course, we must make certain that the administrative agency acts within its legislatively delegated authority and that it adheres to its duly promulgated rules and regulations. However, we are obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs. See *80 Barone v. Dep't of Human Services, 210 N.J. Super. 276, 285, 509 A.2d 786 (App.Div. 1986), aff'd, 107 N.J. 355, 526 A.2d 1055 (1987).

I
Appellants contend that the decision of DEP to issue an air pollution control permit for the Crown/Vista facility should be reversed because DEP reviewed the project under pre-1990 Clean Air Act regulations. Specifically appellants argue that the issuance of the permit was contrary to the 1990 amendments to the Act, 42 U.S.C.A. § 7511a (the 1990 amendments), in that the proposed facility will emit more than twenty-five tons per year of volatile organic chemicals.
Respondent and DEP disagree with this position and urge that DEP's determination to grandfather respondent's application and to use the then-existing rules was consistent with official transitional guidance issued by the United States Environmental Protection Agency (EPA) and DEP's regulations.
Some background is required to better understand this argument. Under the Act, states are required to adopt measures to reduce pollutants to the levels mandated by the 1990 amendments. 42 U.S.C.A. § 7511a. The Act divides regions into attainment and non-attainment areas for achievement of the improvement of air quality by complying with national primary and secondary air quality standards (NAAQS). 42 U.S.C.A. § 7407. Those areas with pollutant levels at or below national air quality standards as defined by the Act constitute attainment areas; those with pollutant levels above the maximum air quality standards are non-attainment areas. 42 U.S.C.A. § 7407 and § 7501(2). Where a facility is located in an non-attainment area, the applicant must use technology capable of achieving the "lowest available emission rate" (LAER), as defined by the Act. 42 U.S.C.A. § 7501(3). Because New Jersey has a program that is essentially equivalent to or more stringent than the federal regulatory scheme, it has received full authorization from the EPA to apply its standards in both attainment and non-attainment areas. Matter of Pennsauken *81 Solid Waste Management Auth., 238 N.J. Super. 233, 249, 569 A.2d 826 (App.Div. 1990).
In addition, under the Act each state must develop, subject to EPA approval, a state implementation plan (SIP) to implement, maintain and enforce the NAAQS for each regulated pollutant, including ozone. 42 U.S.C.A. § 7410. Regulations adopted in order to achieve compliance with NAAQS are included within a state's SIP; the EPA is the ultimate approval authority for SIP submissions; and no state SIP is effective unless and until EPA grants approval. 42 U.S.C.A. § 7410.
Under the 1990 amendments most of New Jersey, including Gloucester County, was classified as a severe area for ozone. 40 C.F.R. § 81.331 (1991). As a severe area, New Jersey is required to make extensive submissions to the EPA, including an amendment to its SIP. New source emissions are to be reduced to compensate for greater emissions from other sources. These requirements apply to sources that emit, or have the potential to emit, at least twenty-five tons per year of VOC, a primary cause of ozone. 42 U.S.C.A. § 7511a(d).
Prior to the 1990 amendments the level of permitted VOC emissions had been fifty tons per year, see 40 C.F.R. § 52 (1981), which level had been included in regulations adopted by DEP and in New Jersey's approved ozone SIP. 17 N.J.R. 277 (February 4, 1985). The 1990 amendments required that the New Jersey SIP be revised over the ensuing two years to provide for strategies that will result in attainment of NAAQS by the new statutory deadlines. 42 U.S.C.A. § 7511a(d)(1). The revised SIP must provide that a permit is required for the construction and operation of new or modified major stationary sources anywhere in the non-attainment area. 42 U.S.C.A. § 7502(c)(5). DEP was required to submit to EPA a revised SIP including all necessary implementing regulations by November 15, 1992. 42 U.S.C.A. § 7511a(d) and § 7502(b).
The Act also included a savings clause which provides:

*82 Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990 [the date of the enactment of the Clean Air Act Amendments of 1990] shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this Chapter.
[42 U.S.C.A. § 7410(n)(1).]
As of the November 15, 1992 statutory deadline, New Jersey had not yet submitted and obtained EPA approval of its revised SIP in accordance with 42 U.S.C.A. § 7511a.
EPA recognized that many states would not meet the deadlines required in the 1990 amendments. On March 11, 1991, EPA issued an initial transitional memorandum entitled "New Source Review Transitional Guidance." Later, on September 3, 1992, EPA supplemented that memorandum by clarifying its guidance regarding the permitting of new or modified sources in situations where a state does not submit a revised SIP implementing the relevant 1990 amendments by the applicable statutory deadline. Under the EPA policy, states that have not adopted new SIP's by November 15, 1992, may review sources that have submitted complete permit applications by November 15, 1992, under the state's pre-1990 amendment regulations.
Although DEP was not able to meet the November 15, 1992 deadline, it acted to implement the 1990 amendments. On October 5, 1992, DEP published notice of its proposed amendments to its emission offset rules, N.J.A.C. 7:27-18.1 to -18.12, to implement the 1990 amendments. 24 N.J.R. 3459(a). These proposed amendments reduced the thresholds at which new facilities must obtain offsets and required an air quality impact analysis. 24 N.J.R. 3474-75. Consistent with federal policy, the new regulations included a grandfather provision for sources that submitted completed applications to DEP by November 15, 1992. These new regulations were adopted on March 15, 1993, and became operative on April 20, 1993.
We now address respondent's application. On October 21, 1992, DEP determined that respondent's permit application was complete. *83 Consistent with the EPA's guidance and its own proposed new regulations, DEP reviewed the application under its pre-1990 amendment regulations, which were the only regulations in effect at that time.
Contrary to appellant's contention, we find no error in DEP's determination to apply its pre-1990 amendment regulations to respondent's permit application. We are satisfied that the DEP's determination to apply its pre-1990 amendment non-attainment rules to respondent is consistent with 42 U.S.C.A. § 7410(n). Moreover, DEP's grandfathering policy is consistent with EPA's March 11, 1991 New Source Review Transitional Guidance as supplemented on September 3, 1992, expressly endorsing the grandfathering of projects that submitted applications by November 15, 1992.
Several other jurisdictions have reached this same result in similar circumstances. In Citizens for a Better Environment v. Wilson, 775 F. Supp. 1291 (N.D.Cal. 1991), plaintiffs argued that the amendments to the Act supplemented a 1982 regional SIP, and that the application should be governed solely by the 1990 amendments. Id. at 1295. The court decided that once the EPA approves a SIP, the state is required to comply with it unless and until a new, revised SIP is formally approved and takes its place. Id. at 1296. Consequently, the court concluded that the savings clause, U.S.C.A. § 7410(n)(1), saves commitments in existing SIPs pending adoption and approval of a new revised SIP by EPA. Id. at 1296-97. In addition, the court noted that Congress made it clear that SIPs remain in force until a new SIP is approved regardless of whether the statutory deadline for achieving federal air quality standards has passed. Id. at 1297. See also Coalition Against Columbus Center v. City of New York, 967 F.2d 764, 772 (2nd Cir.1992) (states have continuing obligation to meet the specific requirements of the existing SIP until the EPA approves a revised version pursuant to the 1990 amendments.)
Here, EPA had not yet approved a new revised SIP for New Jersey. Therefore, DEP's existing SIP which reflects the maximum *84 fifty tons per year of VOC emissions is the controlling provision. The emissions of VOC's from respondent's facility will not exceed fifty tons. Accordingly, DEP's consideration and approval of respondent's permit application complies with the then existing SIP.

II
Appellants next contend that the grant of the permit should be vacated because the definition of a complete application in N.J.A.C. 7:27-18.1 is void since it does not include any criteria or standards for determining when an application is complete.
Appellants rely on Lower Main Street Assoc. v. N.J. Housing & Mortgage Finance Agency, 114 N.J. 226, 553 A.2d 798 (1989), in support of their argument. In that case, the Court held a regulation prohibiting prepayment of mortgage loans without prior approval by the agency to be invalid because it provided "no standards whatsoever" to guide the agency's exercise of discretion in determining whether to approve requests for prepayment of an agency-financed mortgage loan. Id. at 229, 235, 553 A.2d 798.
However, where a regulation does provide some standards or criteria, a substantial degree of discretion allows the agency the flexibility to deal with the varying circumstances. Matter of Health Care Administration Bd., 83 N.J. 67, 415 A.2d 1147, cert. denied sub. nom. Wayne Haven Nursing Home v. Finley, 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980); Trap Rock Industries, Inc. v. Kohl, 59 N.J. 471, 483-84, 284 A.2d 161 (1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).
For example, in Department of Health v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366, 372, 384, 242 A.2d 21 (App.Div. 1968), aff'd, 53 N.J. 248, 250 A.2d 11 (1969) (per curiam), we rejected a vagueness challenge to the validity of portions of the Air Pollution Control Act and regulations that prohibited emission of air contaminants "in quantities which shall result in air pollution." *85 After noting the strong presumption in favor of the validity of a statute we stated:
When dealing with the question of standards, a court is not confined to the specific terms of the particular section in question, but must examine the entire act in the light of its surrounding[s] and objectives. Standards may reasonably be implied from a consideration of the statutory scheme as a whole.
[Id. at 382-383, 242 A.2d 21.]
Applying these guidelines here, we note that the regulation defines complete as follows:
"Complete" means, in reference to an application for a permit, that the application contains all of the information necessary, as determined by the Department, for commencing technical review of the application. Designating an application complete for purposes of commencing technical review does not preclude the Department from requesting or accepting any additional information.
[N.J.A.C. 7:27-18.1.]
In addition, the regulations provide for certain requirements concerning permit applications. The applications must be submitted on "forms obtained from the [DEP]." N.J.A.C. 7:27-8.4(a). DEP may require information and testing regarding processes and equipment an applicant proposes to use to determine compliance with State or Federal laws. N.J.A.C. 7:27-8.4(b). A new source performance standard applicability demonstration shall be submitted. N.J.A.C. 7:27-8.4(e). Finally, air quality simulation modelling shall be submitted for certain types of applications. N.J.A.C. 7:27-18.3(a).
We are satisfied that the combination of the foregoing requirements provides a sufficient standard to determine whether an application is complete. We note, also, that under federal regulations "complete" in reference to an application for a permit is defined to mean that:
the application contains all the information necessary for processing the application. Designating an application for purposes of permit processing does not preclude the reviewing authority from requesting or accepting any additional information.
[40 C.F.R. § 51.166(b)(22) (1992)].
Thus, the federal definition of "complete" is very similar to DEP's regulation. Moreover, DEP must have the flexibility to request additional information before reaching a decision on the permit. *86 A request for additional information does not mean that the application is not complete for review purposes. See Citizens Against Refinery's Effects v. E.P.A., 643 F.2d 178, 182 (4th Cir.1981). In this highly complex and technical area, the expertise of the administrative agency is required. Moreover, "[t]he presumed validity of administrative regulations is consistent with our traditional deference to an agency's interpretation of novel legislation." In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 451, 608 A.2d 288 (1992).
Accordingly, we reject appellant's contention that the definition of "complete" in N.J.A.C. 7:27-18.1 lacks sufficient standards for determining when a permit application is complete.

III
We turn now to appellants' contention that the permit should be vacated because there is no support in the record that DEP conducted an independent analysis of the VOC emission levels submitted by respondent in its permit application. Appellants urge that neither the permit nor the hearing officer's report disclosed how DEP arrived at the VOC emission numbers.
Contrary to appellants' contention, DEP determined that the total annual emission rates for the facility would be 49.33 tons, which is less than the fifty tons per year threshold that would have triggered other requirements. Rajesh Patel, Principal Environmental Engineer for DEP's Bureau of Air Quality Engineering, reviewed respondent's application and the VOC calculations and was satisfied that respondent accurately calculated VOC emissions. In his certification, Patel stated:
As part of my review of the Crown/Vista Energy Project, I calculated the VOC emissions from all sources at the proposed facility. My calculation took into account VOC emission rates and hours of operation from the two pulverized coal fired-boilers, the car thaw shed, the ammonia removal towers (units # 1 and # 2), and the cooling towers (units # 1 and # 2). This is an accepted way of calculating VOC emissions, in accordance with [DEP] and EPA policies.
Based on his calculations, Patel concluded the total VOC emission from the facility will be 49.33 tons per year. Moreover, as DEP *87 points out, based upon appellants' own calculations, the VOC emission will be less than fifty tons per year (49.9758 tons).
We are satisfied that DEP sufficiently reviewed and verified respondent's submission regarding the VOC emissions. We defer to an administrative agency's expertise in relation to technical matters. Petition of Adamar of New Jersey, Inc., 222 N.J. Super. 464, 470, 537 A.2d 704 (App.Div. 1988). This is particularly true when the matter involves extremely complex scientific formulas. GAF Corp. v. New Jersey Dep't of Environmental Protection, 214 N.J. Super. 446, 452-53, 519 A.2d 931 (App.Div. 1986).
In any event, we note that the permit here is not final. DEP also required respondents to conduct stack tests and other measurements, including water quality monitoring of the cooling towers, before a permanent certificate would be issued. Further, because the emissions are close to the fifty tons per year threshold, DEP required respondent to install continuous emissions monitors on the two boilers to record emissions every minute to ensure that the emissions do not exceed the permitted levels.

IV
Finally, we address appellants' argument that the permit issued to respondent is unlawful because respondent failed to obtain a certificate of need pursuant to EFNA, N.J.S.A. 48:7-16 to -25.
Respondent argues that both the DEP's Office of Energy and the Board of Public Utilities (BPU) have determined that respondent is not a public utility and is not subject to EFNA. In addition, respondent urges that in accordance with established principles, we must defer our interpretation to that rendered by the administrative agency charged with responsibility for implementing the statute. See Metromedia, Inc. v. Director, Division of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984). Further, respondent asserts that absent a showing that the decision of the administrative agency was arbitrary, capricious, or unreasonable, *88 the agency's decision must be upheld. See Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 71, 494 A.2d 804 (1985).
Under EFNA, no public utility is allowed to commence construction of an electric facility without first obtaining a certificate of need from the Department of Energy, N.J.S.A. 48:7-19. A certificate of need may only be issued if it is determined "that the proposed facility is necessary to meet the projected need for electricity in the area to be served, and that no more efficient, economical, or environmentally sound alternative is available." N.J.S.A. 48:7-21. N.J.S.A. 48:2-13 defines the term public utility:
The term "public utility" shall include every ... corporation ... that now or hereafter may own, operate, manage or control within this State any . .. gas, electric light, heat, power, water [or] oil .. . [system], plant or equipment for public use, under privileges granted or hereafter to be granted by the State by any political subdivision thereof.
We need not address this argument regarding respondent's failure to obtain a certificate of need. We are satisfied that the issue was decided in 1991, when the BPU determined that respondent's facility was not a public utility. In August 1990, respondent petitioned the BPU for a declaratory order that its facility was not a public utility and was exempt from EFNA. In two separate orders, dated January 18, 1991, the BPU concluded that based upon the structure of the project, respondent's "facility is not a public utility within the meaning of N.J.S.A. 48:2-13." At the same time, the BPU approved the power purchase agreements between JCP & L and respondent. The appellants did not appeal from these orders. To permit further review of BPU's declaratory orders would essentially render the declaratory procedure a nullity. We will not do that. Moreover, we find no clear error or manifest injustice in BPU's declaratory ruling which might justify allowing appellant's late challenge.
In sum, we are convinced that respondent is entitled to rely upon the BPU's declaratory rulings of January 18, 1991, that its facility is not a public utility. We reject appellant's untimely attempt to collaterally attack the BPU's prior declaratory rulings.
The final determination of the DEP is affirmed.
NOTES
[1] On the same date, Crown/Vista submitted an application for a prevention of significant deterioration of air quality permit (PSD) to the DEP, to whom the Environmental Protection Agency (EPA) has delegated authority to review. 40 C.F.R. 52.21; 40 C.F.R. 124.41. Issuance of a PSD permit by DEP is subject to review by EPA's Environmental Appeals Board (EAB). 40 C.F.R. 124.19. DEP ultimately issued a PSD permit in this case, and the EAB issued an order denying appellants' request for review.