712 A.2d 1170 (1998)
The BEATTYSTOWN COMMUNITY COUNCIL, Appellant,
v.
The DEPARTMENT OF ENVIRONMENTAL PROTECTION, Green Eagle Property Resources Limited Partnership, and Township of Mansfield, Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 1998.
Decided June 22, 1998.
*1171 Michele R. Donato, Lavallette, for appellant.
William J. O'Hagan, Jr., Neptune, for respondent Green Eagle Property Resources Limited Partnership (Stout & O'Hagan, attorneys; Mr. O'Hagan, of counsel; Laurence I. Rothstein, on the brief).
Valerie Anne Gray, Deputy Attorney General, for respondent Department of Environmental Protection (Peter Verniero, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Gray, on the brief).
Respondent Township of Mansfield did not file a brief.
Elizabeth S. Merritt, Washington, DC, of the District of Columbia bar, admitted pro hac vice, for amici curiae National Trust for Historic Preservation and Preservation New Jersey, Inc. (Cooper, Rose & English, attorneys; Roger S. Clapp, Summit, of counsel; Paul W. Edmonson, San Diego, CA, Ms. Merritt and Laura S. Nelson, Washington, DC, on the brief).
Before Judges DREIER, KEEFE and PAUL G. LEVY.
The opinion of the court was delivered by PAUL G. LEVY, J.A.D.
Green Eagle Property Resources Limited Partnership (Green Eagle) obtained local approvals to build a large shopping center at the northeast corner of the intersection of State Route 57 and Airport Road in Mansfield Township, Warren County. As part of the project, certain improvements were to be *1172 made to these two intersecting roads. The improvements required application to and approval of the Department of Environmental Protection (DEP) because they were located within the Beattystown Historic District. After public hearings before the Historic Sites Council (HSC), the Assistant Commissioner of DEP in charge of such applications approved the roadway improvements. A local citizens' group, Beattystown Community Council (BCC), opposed Green Eagle's application. In this appeal, BCC contends the DEP approval was erroneous. We disagree and affirm.[1]
Green Eagle pursued DEP approval of the encroachment on the Beattystown Historic District by submitting an appropriate application. A public hearing was scheduled before the HSC, an advisory body empowered to make recommendations to the DEP. After the first HSC hearing, Assistant Commissioner Hall ruled that "[a] more complete examination of the traffic patterns associated with improvements within the historic district" was appropriate, as was exploration of the possibility of "less urban traffic standards." He also required Green Eagle to "[p]rovide more detail with plans and elevations of the proposed landscape treatment strictly within the [road right-of-way] limits within the historic district" and that the matter should be remanded to the HSC for further study in these areas. Finally, he ruled that the HSC should not consider the State Development and Redevelopment Plan (State Plan) in making its recommendations related to this application.
Further testimony was taken by the HSC, and the record was returned to the Assistant Commissioner for his final decision. By letter dated April 9, 1997, Hall approved the construction of the road improvements in question, provided that (1) a proposed concrete traffic island in the intersection was eliminated; and (2) certain aesthetic and color changes to the traffic light and paving were implemented.
On appeal, BCC contends that the Commissioner (1) failed to require exploration of "prudent and feasible alternatives" to avoid the encroachment; (2) failed to consider the State Plan in making this decision; and (3) otherwise acted arbitrarily and capriciously in granting this approval.
The Beattystown Historic District achieved its status as a state and national historic site in 1990. Its historical significance comes from its "settlement pattern, industry, architecture, and commerce.... The Village is an example of the settlements that developed in the West Jersey proprietorship in the 18th Century. Beattystown is the oldest settlement in Mansfield Township, having been established by 1762." The "industrial focus" of the early settlement can still be seen there from two buildings dating back to the 18th century. It still "retain[s] its essentially 19th century character and form." Aside from the buildings, Route 57 itself also has historical significance.
The District, approximately 60 acres in size, is located primarily in an area to the west of the Route 57/Airport Road intersection which is the focus of this appeal. But to the east of the intersection, the District extends for 1,360 feet along Route 57, one of its boundary lines being 100 feet north of the centerline of Route 57. Green Eagle's project will occupy 3.9 percent of the district, all of it being on the north side of Route 57 east of the intersection.
Green Eagle's site plan application included a traffic report showing that even without the proposed development, the intersection was too busy and frequently operated in a "failure" condition. Accordingly, it was agreed that certain improvements were required, including installation of a traffic light and widening of the lanes on Route 57 from 24 feet to 42-47 feet and Airport Road from its current 30 to 36-48 feet. The proposed roadway improvements would occupy an additional 0.6 percent of the space within the historic district.
*1173 This application is governed by N.J.S.A. 13:1B-15.131, which provides:
The State, a county, municipality or an agency or instrumentality of any thereof shall not undertake any project which will encroach upon, damage or destroy any area, site, structure or object included in the Register of Historic Places without application to, and the prior written authorization or consent of, the Commissioner of Environmental Protection. The commissioner shall solicit the advice and recommendations of the Historic Sites Council in connection with any such application and may direct the conduct of a public hearing or hearings thereon prior to granting or denying authorization or consent. The failure of the commissioner to authorize, consent or deny any such application within 120 days of application therefor shall constitute his consent thereto.
Implementing regulations govern any action by a governmental entity "which has the potential to result in direct or indirect effects on any [registered historic] district," such as Beattystown. N.J.A.C. 7:4-1.3.[2] An application to proceed with such an "undertaking" must be submitted to the DEP, which must render a decision within 120 days from receipt of the final form of the application. N.J.A.C. 7:4-7.2(a), (b).

I.
In analyzing the application, the DEP's first step is to determine whether the undertaking constitutes an encroachment. N.J.A.C. 7:4-7.2(e). The DEP found that this particular roadway improvement did encroach the district "in the public right of way," as distinguished from other local site plan considerations, not relevant to the DEP inquiry. As explained in his final decision, the Assistant Commissioner found that the road widening and improvement would "have an adverse impact on the district, [but] they are not avoidable in [his] opinion." He concluded that "the record is clear that there are no meaningful alternatives to making some road and traffic improvements."
The regulations next provide that the HSC must consider the "Secretary of the Interior's Standards for the Treatment of Historic Properties (36 C.F.R. Part 68) and `Guidelines for Preserving, Rehabilitating, Restoring, and Reconstructing Historic Buildings,'" issued by the National Park Service. The regulations then require the HSC to consider the following:
i. The public benefit of the proposed undertaking;
ii. Whether or not feasible and prudent alternatives to the encroachment exist; and
iii. Whether or not sufficient measures could be taken to avoid, reduce or mitigate the encroachment.

[N.J.A.C. 7:4-7.2(e)(4) ].
The proposed alternatives to a signalized and widened intersection were:
1. An overpass, in which the left turn traffic from Airport Road would be sent onto the overpass "on a structure which would span over Route 57." This was rejected as creating a far greater intrusion into, and impact upon, the historic district, than would a widened and signalized intersection.
2. A proposal to lessen the scope of the roadway widening, specifically, widen Route 57 only to 37 feet and widen Airport Road only to 36 feet. The Department of Transportation rejected this option as "substandard", stating that the road widening was necessary to promote both "efficiency" and "safety" and this intersection. In rejecting this option, DEP noted that pre-existing traffic conditions caused by previously-constructed *1174 housing and commercial developments in the area (Kensington Estates and Mansfield Village Square, respectively), meant that some improvements to the intersection would have to be made, even without Green Eagle's project.
3. "Cosmetic" changes to the proposed intersection, dealing with the style and coloring of the traffic lights and curbing. This recommendation was accepted by Assistant Commissioner Hall even though there was testimony in the record that it would do little to offset the intersection's negative impact on the historic district.
4. Eliminate the proposed concrete island at the intersection, which was also accepted by the Assistant Commissioner.
5. Require the developer to build a service road along the northern perimeter of the shopping center in order to divert traffic from the intersection. The theory behind this plan would be that the service road would take up traffic which would otherwise pass through the Route 57/Airport Road intersection and hence through the historic district. The developer's engineer responded that this was not a viable alternative, because it would be an "inconsistent design" to have local traffic that was not going to the shopping center, pass through it. Although Hall did not discuss this possible alternative in his decision, the engineer's testimony suffices to support the final decision which did not include a recommendation requiring a service road to alleviate traffic at the intersection.
6. Another alternative, proposed but not seriously considered, was to realign Airport Road, relocating it somewhere to the east of its present location, and away from the historic district. The road "was relocated once before due to safety concerns." A similar alternative that would create "a substantial traffic change directing traffic further to the east" was considered by the HSC but was also rejected.
Assistant Commissioner Hall followed the directions of N.J.A.C. 7:4-7.2(e)(4) and found that:
The public benefit of the proposed undertaking is clearly related to the need to make traffic safety improvements within the public right of way. Without some improvements to the road way and resulting encroachment on the district the added traffic from the shopping plaza would create an unsafe situation to the general public traveling on the existing road system. Whether or not feasible or prudent alternatives to the project exist again must focus on whether the reviewable components (roadway improvements) of the overall project are necessary to support the non-reviewable portion of the project. Finally, whether or not feasible and prudent alternatives could be taken to avoid, reduce or mitigate the encroachment must focus on what modifications can be made to the proposed traffic safety improvements that will lessen adverse impacts on the district without eliminating or unreasonably reducing the safety aspects of the road improvements.
We conclude that this presumptively reasonable decision comports with the statutory mandate and regulatory directions to the DEP, leaving no warrant for our intervention. See Matter of Musick, 143 N.J. 206, 670 A.2d 11 (1996); Matter of Crown/Vista Energy Project, 279 N.J.Super. 74, 79, 652 A.2d 212 (App.Div.), certif. denied, 140 N.J. 277, 658 A.2d 301 (1995).
We also reject BCC's argument, joined by the amici curiae, that in deciding whether or not "feasible and prudent alternatives" exist, the DEP should rely on decisional law interpreting certain federal regulations and statutes. They argue that both state and federal historic-preservation statutes (N.J.S.A. 13:1B-15.131 and 16 U.S.C.A. §§ 470 to 470w-6) "are intended to be parallel in their applications and are similar in intent." Appellants also point to a provision of the National Environmental Protection Act, 42 U.S.C.A. § 4332, which, in essence, requires a stringent environmental-impact statement for federal government action having a significant effect on the environment. Finally, they rely on Section 4(f) of the Transportation Act, 49 U.S.C.A. § 303, for the proposition that a stringent alternatives analysis should be required under the state regulations.
*1175 N.J.S.A. 13:1B-15.131 is clearly different than the National Historic Preservation Act, specifically 16 U.S.C.A. § 470(f). The Commissioner of DEP has more power to stop a project than does the federal Advisory Council on Historic Preservation, and he can deny a project pursuant to the state regulations. There is no need for stringent application forms or agency procedure that complies with the federal regulations when the Commissioner can deny an application after the prescribed State review.
The same philosophy applies to the proposed application of the National Environmental Protection Act. New Jersey has not enacted a strict version of that Act, but it does require formal Environmental Impact Statements when the State is involved in certain larger-scale projects. The lack of formality required to consider "feasible and prudent alternatives" keeps the review at an appropriate level for the scope of this project. Similarly, application of the federal Transportation Act is inappropriate because the Legislature has not adopted its particular policy concepts as to historic sites and highways.
Simply put, N.J.S.A. 13:1B-15.131 does not direct emulation of any of the three federal legislative schemes asserted by BCC. The New Jersey version of reviewing "feasible and prudent alternatives" is reasonable.

II.
BCC's second contention attacks Assistant Commissioner Hall's earlier decision remanding the matter for further investigation by the HSC, insofar as he directed the HSC to concentrate on areas other than the State Plan because that consideration was beyond the jurisdiction of the HSC. Hall said:
The Commissioner's administrative order which looks to use the state plan as guidance within existing statutory authority [Executive Order No. 1996-06] ... does not apply to this application given the constraints of the N.J. Register of Historic Places Act.
Nevertheless, he reviewed "the issue of conformance" with the State Planning Office and determined that the project conformed with the master plan of Mansfield Township. He therefore concluded that even if the State Plan was applicable to this application, the issue was moot because the project in fact complied with the township's Master Plan.
The BCC argues that this was in error because the Assistant Commissioner violated the Executive Order by failing to judge this application according to standards set forth in the State Plan which (1) recognizes the value of historic preservation generally and (2) recognizes Mansfield Township specifically as a "hamlet" in which growth should be limited. We upheld the issuance of the Executive Order in New Jersey Builders Assn. v. New Jersey Dept. of Env. Prot., 306 N.J.Super. 93, 703 A.2d 323 (App.Div.1997), noting the limitations of what the State Plan could properly be used for, and hence, what limitations applied to the Executive Order. But we also recognized that use of the State Plan as an overlay on decisions vested by law in municipal agencies is different than its use to affect decisions delegated to State agencies. Here, we have a different situation than the one presented in New Jersey Builders, involving a historic preservation decision delegated to a State agency, and hence more akin to "state or regional planning" than local planning. The statutes vest decisions on development encroaching on historical areas in the DEP Commissioner, not in local boards. What this means is that the tension created by the State Plan and the concept of local decisions on zoning, and addressed in New Jersey Builders, simply does not exist in this case.
The question of whether State agencies' plans should be consistent with the State Plan was not discussed in New Jersey Builders. The regulations are clear that county and municipal agencies need to give no deference whatsoever to the State Plan, even though they are encouraged to do so. N.J.A.C. 17:32-7.1(a). But the regulations are silent in terms of what deference State agencies must give the State Plan. Moreover, the State Plan itself suggests that State agencies should consider it in planning decisions even though they are not bound by it:
The State Plan is not a regulation but a policy guide for State, regional and local agencies to use when they exercise their *1176 delegated authority. For example, the State Plan does not automatically change the criteria for the issuance of a State permit, but it does contemplate that the agency responsible for issuing permits should review its plans and regulations in light of the State Plan and make appropriate modifications to reflect the Goals, Strategies, Policies and Objectives of the Plan, if such modifications are within the scope of the agency's authority.

[N.J. State Development and Redevelopment Plan (June 12, 1992), at 6].
The real question is how the State Plan should be used for decisions not on other plans, but on individual matters. The Plan itself says that "it is not designed to regulate and should not be applied to the future use or intensity of use of specific parcels of land." Id. at 13. On the narrower question of whether the state planning office will use the State Plan to review decisions dealing with a specific tract of land, the answer again is a consistent "no." See N.J.A.C. 17:32-6.2(b) (planning commission "will not issue letters of clarification that involve the application of State Plan provisions to specific parcels of land"). Both of these statements do not distinguish between State and local entities.
We conclude there is no basis for applying the State Plan to the specific application under review here. Appellant may be correct in stating that "the Legislature intended that State agencies would at least minimally review the State Plan and make efforts to be consistent with its purpose and intent." This is true as to planning, but it does not seem to be true in regard to individual applications. Here, the Assistant Commissioner held that the State Plan was not a relevant consideration in deciding this application. Because the State Plan explicitly disavows that it should be used in deciding applications on specific tracts of land, the Assistant Commissioner was correct in not using it to decide this application. His broader statement that it has no relevance to historic site planning is incorrect, however, it does not invalidate his decision.

III.
Finally, BCC attacks the DEP decision as arbitrary and capricious, arguing that it violates the legislative intent behind the historic sites law and the implementing regulations. We find no merit to this contention. As we have already said, a state agency's decision is given significant deference, although it may still be reversed if it is "clearly inconsistent with its statutory mission or other state policy," Matter of Musick, supra, 143 N.J. at 216, 670 A.2d 11, or if it does not "adhere[] to its duly promulgated rules and regulations." Matter of Crown/Vista Energy Project, supra, 279 N.J.Super. at 79, 652 A.2d 212. Factors other than historic significance were important here, most especially traffic safety, and BCC has not satisfactorily proved that the historic preservation considerations outweighed these other factors.
Arbitrary and capricious action of administrative bodies means willful and unreasoning action, without consideration and in disregard of circumstances. Where there is room for two opinions, action is [valid] when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.
[Worthington v. Fauver, 88 N.J. 183, 204-05, 440 A.2d 1128 (1982) (quotation omitted).]
We conclude that all alternatives were considered and reasonably dealt with, and the approval of Green Eagle's application was a proper exercise of administrative expertise and discretion.
Affirmed.
NOTES
[1] In July 1995, the municipal Planning Board approved Green Eagle's proposal for a major site plan and minor subdivision for the shopping center. The approval came after Green Eagle submitted, and the Department of Transportation approved, a road access permit at that intersection. BCC unsuccessfully challenged the Board's approval of the site plan in the Law Division.
[2] The statute only governs actions by government and therefore excludes private encroachments upon a historical district. Accordingly, Green Eagle argues that only items subject to review by the Historical Sites Council were the publicly-undertaken road improvements, and not the shopping center itself (even though it too encroaches on the historic district), and the HSC and the DEP accepted this argument. This view is supported by Hoboken Environ. Cmte. v. German Seaman's Mission of N.Y., 161 N.J.Super. 256, 271, 391 A.2d 577 (Ch.1978) which states, as do the current administrative regulations, that the passage of a zoning ordinance, or the grant of a building or demolition permit or zoning variance, does not constitute a governmental undertaking. N.J.A.C. 7:4-1.3. Neither the case nor the regulations discuss whether site plans constitute a governmental undertaking, but we assume here that they do.