OPINION OF THE COURT
ALDISERT, Circuit Judge.
Several New Jersey individual chiropractors and professional organizations that represent chiropractors appeal from the district court’s dismissal of their complaint on the basis of abstention under Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). They contend that the district court should have adjudicated them federal constitutional challenge to certain regulations of New Jersey’s comprehensive no-fault automobile insurance law. The regulations were promulgated by Appellee Jaynee LaVecc-hia, Commissioner of the Department of Banking and Insurance. We will affirm.
I.
On May 19, 1998, in an attempt to reduce escalating automobile insurance costs in the state, the Legislature of the State of New Jersey enacted the Automobile Insurance Cost Reduction Act (the “Act”). The Act substantially restructured New Jersey’s method of providing no-fault insurance benefits to automobile accident victims. This was an amendment of the state’s 1972 no-fault insurance law, which previously had been amended in 1983, 1988 and 1990. The new Act was the result of the Legislature’s determination
that the substantial increase in the cost of medical expense benefits indicate[d] that the benefits [were] being over utilized for the purpose of gaining standing to sue for pain and suffering, ... necessitating the imposition of further controls on the use of those benefits, including the establishment of a basis for determining whether treatments or diagnostic tests are medically necessary.
N.J. Stat. Ann. § 39:6A-1.1. Thus, the Act states in relevant part:
Benefits provided under basic coverage shall- be in accordance with a benefit plan provided in the policy and approved by the commissioner. The policy form, which shall be subject to the approval of the commissioner, shall set forth the benefits provided under the policy, including eligible medical treatments, diagnostic tests and services as well as such other benefits as the policy may provide. The commissioner shall set forth by regulation a statement of the basic benefits which shall be included in the policy. Medical treatments, diagnostic tests, and services provided by the policy shall be rendered in accordance with commonly accepted protocols and professional standards and practices which are commonly accepted as being beneficial for the treatment of the covered injury.... Protocols shall be deemed to establish guidelines as to standard appropriate treatment and diagnostic tests for injuries sustained in automobile accidents, but the establishment of standard treatment protocols or protocols for the administration of diagnostic tests shall not be interpreted in a[sic] such a manner as to preclude variance from the standard when warranted by reason of medical necessity.
N.J. Stat. Ann. § 39:6A-3.1(4)(a). “Medical necessity” exists when treatment of the particular injury “(1) is not primarily for the convenience of the injured person or provider, (2) is the most appropriate standard or level or service which is in accordance with standards of good practice and standard professional treatment protocols ... and (3) does not involve unnecessary diagnostic testing.” N.J. Stat. Ann. § 39:6A-2m.
The precise constitutional attack lodged by these Appellants concentrates on six so-called “care paths” in the comprehensive regulations developed by the Commissioner with the assistance of Pricewaterhouse-Coopers. These care paths are a set of protocols and standard treatments and practices for specific diagnosed back injuries. Each care path designates the appropriate treatment for particular back in *102 juries that can be reimbursed absent a showing of medical necessity. See N.J. Admin. Code § 11:3-4. The regulations also include an arbitration mechanism for resolution of disputes concerning the medical necessity of treatment that deviates from or exceeds that which has been delineated in the care paths.
On September 8, 1998, the Commissioner published the proposed regulations, see 30 N.J. Reg. 3211, and received,, comments from the public through November 4, 1998. On November 4, 1998, the Commissioner held a public hearing to receive testimony concerning the proposed regulations. Representatives of health care providers, including chiropractic associations, attorneys and insurers, submitted written comments to the proposed regulations and presented testimony at the public hearing. Appellants stated that the care paths were “ill-conceived, detrimental to patient care, and dangerous.”
After making minor modifications to the proposed regulations, the Commissioner signed the regulations for adoption on November 30, 1998. These modified regulations were scheduled to become operative on March 22, 1999. See 30 N.J. Reg. 4401(a).
Appellants filed their initial complaint in the district court on November 4, 1998, before the Commissioner adopted the regulations. After the regulations were adopted, three appeals challenging the regulations were filed in the New Jersey Superior Court, Appellate Division, one by physicians and other health care professionals and two by trial lawyers associations. Thereafter, in their First Amended Complaint filed in the district court on January 12, 1999, Appellants alleged that the regulations violated their Fourteenth Amendment substantive due process, procedural due process and equal protection rights. Before us, Appellants explain:
The final regulations contain only two changes concerning chiropractic care that are relevant to this lawsuit. First, chiropractors can now treat auto accident victims with no serious injuries, (i.e. sprains and strains under care paths one, three and five for up to twelve visits during the first month...).
The final regulations state that chiropractors can treat patients with radicu-lopathy or herniated discs, (i.e. patients who fall under care paths two, four and six) as long as they have no positive or objective findings for either conditions.
Appellants’ Brief at 5.
The First Amended Complaint alleged that the care paths eliminate the availability of reimbursable chiropractic care for victims of automobile accidents and severely restrict the number of reimbursable chiropractic care visits allowed in the first month following an automobile accident. Appellants based their substantive due process and equal protection claims on assertions that the care path provisions were arbitrary and capricious and were not rationally related to the legitimate aim of the enabling legislation. See App. at 50-51. As to their procedural due process count, Appellants contended that the regulations’ arbitration provisions “den[ied] health care practitioners any practical right to contest the medical treatment judgments of the [personal injury protection benefits] carriers.” App. at 52. Appellants sought declaratory and injunctive relief.
On the very next day, January 13, 1999, Appellants filed an appeal in the New Jersey Superior Court that sets forth issues similar to those contained in the appeals of the health care professionals. Both of these appeals are now pending before the New Jersey Superior Court, and challenge the regulations as being beyond the scope of the Department of Banking and Industry, and as establishing rigid care paths and treatment mandates contrary to accepted standards of medical care. They contend that the regulations unreasonably substitute the agency’s dictates for professional medical judgment of the injured person’s physician by specifying the precise care to be provided. They contend *103 also that the agency has acted in a manner inconsistent with the enabling legislation. See S.A. at 128, 139. All three groups of Appellants — health care professionals and physicians, attorneys and chiropractors— contend in these appeals that the regulations were adopted without appropriate consultation with national and state standard-setting for professional organizations. See S.A. at 128, 130,139.
The district court abstained from ruling on Appellants’ federal constitutional claims on the basis of Burford, and dismissed Appellants’ First Amended Complaint. We have jurisdiction to consider the present appeal pursuant to 28 U.S.C. § 1291. Regarding a district court’s abstention decision, our review of the underlying legal questions is plenary, but we review the decision to abstain for abuse of discretion. See Trent v. Dial Medical of Fla., Inc., 33 F.3d 217, 223 (3d Cir.1994).
II.
At least since 1941, in Railroad Comm’n of Texas v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the federal courts have recognized circumstances under which they will decline to adjudicate cases even though they have jurisdiction under the Constitution and statutes. These circumstances are loosely gathered under discrete concepts of abstention named after leading Supreme Court cases. The Court has said: “The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of consideration designed to soften the tensions inherent in a system that contemplates parallel judicial processes.” Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n. 9, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).
Abstention from the exercise of jurisdiction, however, is the exception rather than the rule. Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Nevertheless, abstention is firmly rooted.
Several reasons are assigned for withholding the exercise of jurisdiction. Abstention is recognized to avoid deciding a federal constitutional question when the case may be disposed on questions of state law, Pullman; to avoid needless conflict with the administration by a state of its own affairs, Burford; to leave to the states the resolution of unsettled questions of state law, Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); to avoid du-plicative litigation, Colorado River. In addition, the doctrine of “Our Federalism” teaches that federal courts must refrain from hearing constitutional challenges to state action under certain circumstances in which federal action is regarded as an improper intrusion on the right of a state to enforce its own laws in its own courts, Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).
At the risk of over-simplification, we can say that these reasons come within the rubric of comity, or the idea “that certain matters are of state concern to the point where federal courts should hesitate to intrude; and they may also concern judicial ‘economy,’ the notion that courts should avoid making duplicate efforts or unnecessarily deciding difficult questions.” Bath Memorial Hosp. v. Maine Health Care Fin. Comm’n, 853 F.2d 1007, 1012 (1st Cir.1988).
We will affirm the district court’s judgment on the basis of Burford abstention. We conclude that the Act and the regulations promulgated by the Commissioner represent a complex legislative and regulatory package designed to reform automobile insurance law in New Jersey, and that the courts of New Jersey are in the best position to consider the validity of the applicable regulations under state law, and can do so without having to examine the constitutional questions that have been raised by Appellants. “It is particularly *104 desirable to decline to exercise equity jurisdiction when the result is to permit a state court to have an opportunity to determine questions of state law which may prevent the necessity of decision on a constitutional question.” Burford, 319 U.S. at 333 n. 29 (citing Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 173, 62 S.Ct. 986, 86 L.Ed. 1355 (1942)).[1] Thus, Bur-ford clearly allows a federal court, in fact urges a federal court, to decline to exercise jurisdiction when adjudication of questions of state law (which can only be done by state courts) may avert the need to delve into constitutional issues like those presented here. This case fits comfortably into the scheme envisioned by the Burford Court.
In Burford, the Supreme Court stated that a federal court should refuse to exercise its jurisdiction in a manner that would interfere with a state’s efforts to regulate an area of law in which state interests predominate and in which adequate and timely state review of the regulatory scheme is available. See 319 U.S. at 332-334. The purpose of Burford abstention has been articulated by this court: “ ‘to avoid federal intrusion into matters of local concern and which are within the special competence of local courts.’ ” Kentucky West Virginia Gas Co. v. Pennsylvania Public Util. Comm’n, 791 F.2d 1111, 1115 (3d Cir.1986) (quoting International Bhd. of Elec. Workers v. Public Serv. Comm’n, 614 F.2d 206, 212 n. 1 (9th Cir.1980)); see also Meredith v. Talbot Cty., Md., 828 F.2d 228, 231 (4th Cir.1987) (“The underlying purpose of Burford abstention is to enable federal courts to avoid needless conflict with the administration by a state of its own affairs.”); 17A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4243.
Recently the Supreme Court provided a clear definition of the Burford doctrine:
Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are “difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar”; or (2) where the “exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.”
New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting Colorado River, 424 U.S. at 814). It is from this definition that we determine that the district court acted properly when it dismissed Appellants’ First Amended Complaint.
A.
We begin with an analysis of whether timely and adequate state-court review is available, for “[o]nly if [the court] determines that such review is available, should it turn to the other issues.” Riley v. Simmons, 45 F.3d 764, 771 (3d Cir.1995).
Timely and adequate state-court review has been and continues to be available to Appellants. New Jersey law provides that a party may take an appeal as of right to the Superior Court of New Jersey, Appellate Division, for review of a final action of any state administrative agency or officer and for review of the validity of any rule promulgated by any state agency or officer. See N.J. Court Rule 2:2-3(a)(2). Appellants and three other groups of litigants have filed such an appeal of the regulations promulgated by the Commissioner pursuant to the Act.
*105 Appellants contend that the state-court proceeding could not provide timely and adequate review because the Appellate Division would have been unable to resolve the appeal prior to the regulations’ March 22, 1999 effective date. Appellants also contend that the Appellate Division would not provide them with adequate relief because that court could not hold an eviden-tiary hearing. Both arguments fail.
First, the Appellate Division has the authority to accelerate the usual briefing and oral argument schedule, and is empowered to stay agency action pending appeal. See N.J. Court Rule 2:9-7. Further, if the Appellate Division declines its authority to stay the agency action, a party may submit an application for a stay with the Supreme Court of New Jersey “when necessary to prevent irreparable injury.” N.J. Court Rule 2:2-2. Therefore, the Appellate Division had the ability to expedite the proceedings in order to rule on the validity of the regulations at issue here prior to March 22, 1999, or at least stay their enforcement until a ruling is issued.
Second, Appellants incorrectly assert that the Appellate Division is without power to hold an evidentiary hearing. New Jersey court rules permit supplementation of the record on appeal, including the presentation of live witnesses before a specially designated judge of the New Jersey Superior Court. See N.J. Court Rule 2:5-5(b). Further, testimony presented by Appellants during the public hearing on November 4, 1998, as well as documents filed during the public comment period, became part of the record to be considered by the Appellate Division.
Appellants have not demonstrated the absence of timely and adequate state-court review in this matter. We therefore turn to the question of whether a federal court’s adjudication of Appellants’ claims would interfere with New Jersey’s efforts to implement a policy concerning no-fault insurance law.
B.
The district court held, and we agree, that the second prong of the Burford doctrine, as laid out in New Orleans Public Service, supra, is applicable here. This prong of Burford requires us to examine three issues: (1) whether the particular regulatory scheme involves a matter of substantial public concern, (2) whether it is “the sort of complex, technical regulatory scheme to which the Burford abstention doctrine usually is applied,” Felmeister v. Office of Attorney Ethics, 856 F.2d 529, 534 (3d Cir.1988), and (3) whether federal review of a party’s claims would interfere with the state’s efforts to establish and maintain a coherent regulatory policy. See New Orleans Public Serv., 491 U.S. at 361. All three issues can be answered in the affirmative.
There can be no doubt that a state’s efforts to curtail the skyrocketing costs of automobile insurance premiums within its borders present a matter of substantial public concern. New Jersey’s dubious notoriety for “out-of-control” automobile insurance premiums has been well-documented and has reflected negatively on the state. See, e.g., Thomas Ginsburg, NJ Auto Insurance Up 8% in ’96, The Philadelphia Inquirer, Feb. 12, 1998, at A1; Robert Schwaneberg, Insurers, Legislators Blame Car Premium Mess on Each Other, The Star-Ledger, Feb. 5, 1998, at 31; John Kolesar, Stuck in the Middle of the Road: The Legislature’s Failure to Adopt True No-Fault Insurance has Permitted Jerseyans to be Run Over by High Rates, The Star-Ledger, Nov. 23, 1997, at 1; Sharon Tennyson, The Impact of Rate Regulation on State Automobile Insurance Markets, 15 J. Ins. Reg. 502 (July 1, 1997). Since 1972, the New Jersey legislature has attempted to refine its no-fault insurance law in order to create a scheme that will serve New Jersey drivers and their passengers, insurers, health care service providers and those who represent them. The Act and the regulations promulgated by the Commissioner clearly *106 pertain to a matter in which the state has a substantial and important interest.
Additionally, a review of the Act and the regulations establishes that we are presented with a complex regulatory scheme for purposes of Bwford abstention. The Legislature and the Commissioner have promulgated all-encompassing, highly technical, extremely intertwined and interrelated provisions that describe the extent of reimbursable medical treatment, applicable deductibles and co-pays and accepted medical protocols. The regulations include detailed flow charts of the accepted care paths. There is a delineated dispute mechanism in place for accident victims who seek reimbursement for treatments that deviate from the care paths. There can be no doubt that the Act and regulations at issue here constitute a complex regulatory solution to the stated no-fault insurance problem.
Thus, we are left to examine whether federal review of Appellants’ constitutional claims would interfere with New Jersey’s efforts to establish and maintain a coherent regulatory policy. We believe that “ ‘the regulatory system [has] as a central purpose uniformity to achieve important local interests that would be frustrated by federal court review.’ ” University of Md. v. Peat Marwick Main & Co., 923 F.2d 265, 272 (3d Cir.1991) (quoting Erwin Chemerinsky, Federal Jurisdiction 112 (Supp.1990)). The cases relied upon by Appellants present distinguishable factual scenarios from the one presented here, and lend further support for our holding.
The Act and regulations are aimed at reducing the high cost of automobile insurance in New Jersey. The State of New Jersey sought to achieve this goal by revising reimbursement standards for first-party, no-fault personal injury protection medical expense benefits. The regulations address reimbursement for nearly all medical providers who treat automobile accident victims.
Thus, a court conducting a review of Appellants’ due process and equal protection claims would have to examine the purpose of the Act, and determine whether the regulations conformed with the New Jersey Legislature’s intent and whether the regulations singled out chiropractors and their patients for unfair treatment. Clearly, the regulations would be subject to rational basis/arbitrary and capricious examination in either sovereign’s court. See Bowman Transportation, Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (agency action that does not implicate fundamental rights or suspect classes is subject to arbitrary and capricious review in which court examines whether there is rational basis for agency’s action); Brady v. Department of Personnel, 149 N.J. 244, 693 A.2d 466, 472 (N.J.1997) (review of state regulatory policy subject to arbitrary and capricious standard); Beattystown Community Council v. Department of Environmental Protection, 313 N.J.Super. 236, 712 A.2d 1170, 1176 (N.J.Super.Ct.App.Div.1998) (same). Because Appellants, and three other groups of plaintiffs, have presented an “arbitrary and capricious” argument to the Superior Court of New Jersey, Appellate Division, review by this court, or any federal court, at this time would interfere significantly with New Jersey’s efforts to establish and maintain a coherent automobile insurance regulatory policy. See Alabama Pub. Serv. Comm’n v. Southern Railway, 341 U.S. 341, 349, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (“As adequate state court review of an administrative order based upon predominantly local factors is available ... intervention of a federal court is not necessary for the protection of federal rights.”) (footnote omitted). Although Appellants have not raised Fourteenth Amendment claims before the Appellate Division, that court would have to conduct the same form of “arbitrary and capricious” review to resolve Appellants’ state court allegations. The Appellate Division’s scope of review under New Jersey Rule 2:2-3(a)(2) involves an examination of: “(1) whether the *107 agency’s action violates the express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency bases its action; and (3) whether, in applying legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.” Matter of Musick, 143 N.J. 206, 216, 670 A.2d 11 (1996). Appellants’ federal suit is thus entangled in a “skein of state law.” New Orleans Pub. Serv., Inc., 491 U.S. at 361.
The district court recognized the problem:
As in Marks [v. Snedeker, 612 F.Supp. 1158 (D.N.J.1985) ], analysis of the constitutional questions raised in this case would involve an in-depth analysis of the legislative purposes of AICRA, a major reform effort in an area of law — automobile insurance — that has typically been left to the states to regulate. See Lac D’Amiante du Quebec v. American Home Assurance Co., 864 F.2d 1033, 1038-39 (3d Cir.1988) (“the states have assumed the primary role in regulating insurance”). This case requires an analysis of whether the challenged regulations, as they apply to chiropractors and their patients, are consistent with the Legislature’s attempt in enacting AI-CRA to reform New Jersey’s comprehensive no-fault automobile insurance law so as to reduce the high cost of automobile insurance in New Jersey, or whether chiropractors and their patients have been unfairly singled out for unfavorable treatment. The outcome of this inquiry turns upon an assessment of the rationality of the basis for the regulations, which involves an examination of the administrative procedure and the substantive result of the state regulatory scheme. Unlike in cases where the state regulations under constitutional review were enacted to comply with a federal mandate in the particular regulatory field, see, e.g., New Jersey Hospital Assoc. v. Waldman, 73 F.3d 509 (3d Cir.1995) (involving a due process challenge to a state agency’s reduction in Medicaid reimbursement rates mandated by the Boran Amendments to the Medicaid Act, 42 U.S.C. § 1396(a)(13)(A)), there is no federal interest in the regulation of automobile insurance, an area in which Congress has deferred to the states. See Lac D'Amiante, 864 F.2d at 1038-39 (discussing the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15, which provides for exclusive state regulation of the business of insurance).
Dist. Ct. Op. at 20-21, reprinted in App. at 23-24.
III.
That the Appellants have raised federal constitutional challenges to the regulations does not affect our analysis. We do not consider the teachings of Bath Mem. Hosp. v. Maine Health Care Fin. Comm’n, 853 F.2d 1007 (1st Cir.1988), to compel a different result. In that case there was a facial attack on the constitutionality of a statute that regulated hospital charges. Such an attack is not present here. Speaking for the court, then-judge Breyer explained that the Bath plaintiffs:
do not seek individualized faet(or cost-) specific regulatory decision making. To the contrary, they attack the statute as it is written. Permitting a federal court to decide this kind of constitutional claim would not interfere with the workings of a lawful state system, as such intervention threatened in Burford, Alabama P.S.C. [v. S. Ry. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951)] or [Allstate Insurance Co. v.] Sabbagh [, 603 F.2d 228 (1st Cir.1979) ]. Review here would not threaten to create in the federal court a parallel regulatory review institution. The risks of interference here seem no greater than those present whenever a federal court de *108 cides whether a state regulatory statute is constitutional.
853 F.2d at 1014-1015.
In contrast with the circumstances in Bath, the Appellants here do indeed seek individualized fact-specific regulatory decision making. They do not attack the statute as written; they attack only discrete portions of regulations promulgated by the Commissioner, not the legislature, and review here would certainly create in the federal court a parallel regulatory review institution. The very factors that were not present in Bath to militate against applying Burford are unmistakably present in the case at bar. They plainly call for the application of abstention here.
Our focus should not be on whether a federal claim has been presented, but rather on the nature of that claim. Courts have held almost uniformly, for example, that abstention is inappropriate when a federal plaintiff asserts a preemption/Supremacy Clause claim. See, e.g., New Orleans Pub. Serv., Inc., 491 U.S. at 362-363; Kentucky West Va. Gas Co., 791 F.2d at 1115-1116; Middle S. Energy, Inc. v. Arkansas Pub. Serv. Comm’n, 772 F.2d 404, 417 (8th Cir.1985); Baggett v. Department of Professional Regulation, Bd. of Pilot Commissioners, 717 F.2d 521, 524 (11th Cir.1983); International Bhd. of Elec. Workers, 614 F.2d at 212 n. 1. This is because “supremacy clause claims are'essentially one[s] of federal policy,’ so that ‘the federal courts are particularly appropriate bodies for the application of preemption principles.’ ” Kentucky West Va. Gas Co., 791 F.2d at 1115 (quoting Kennecott Corp. v. Smith, 637 F.2d 181, 185 (3d Cir.1980)). Additionally, we have held that abstention is inappropriate in cases in which federal courts have exclusive jurisdiction over at least a portion of the claims presented. See Riley, 45 F.3d at 773-774 (federal court had exclusive jurisdiction over plaintiffs’ rule 10b-5 securities claims).
The reasoning that supports the exercise of federal question jurisdiction in preemption and exclusive jurisdiction cases is not present here. In this case, Appellants assert that the Commissioner and the Department of Banking and Insurance have overstepped their lawful authority in dealing with a substantial and complex local concern. Appellants’ due process attack on the care path regulations requires the same analysis as their state law contentions that the regulations are arbitrary and capricious.[2] Federal court review of Appellants’ substantive due process argument would thereby create a parallel federal regulatory review institution.
A reviewing federal court would be required to delve beyond the text of the regulations in order to adjudicate Appellants’ constitutional claims. It would be required to examine the Commissioner’s motivations, the Legislature’s intent, the overarching goal of a reformed no-fault insurance law and the processés promulgated regarding dispute resolution. These are complex matters of state concern that are currently the subject of the appeals before the Appellate Division. The regulations can, and should, be reviewed by the state court on state law grounds, obviating the need to address constitutional questions. See Burford, 319 U.S. at 333 n. 29.
Abstention under Burford is appropriate in this case. The district court properly applied the law and did not exceed the permissible bounds of discretion when it decided to abstain.
The judgment of the district court will be affirmed.

. The quoted language of Burford. and Field-crest Dairies bears a strong resemblance to the Court’s language in Pullman, thereby exhibiting how the various doctrines are not "rigid pigeonholes.”

. Appellants limited their New Jersey court contentions to state law under an appropriate reservation. See England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).