

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-2-2004

# Hi Tech Trans LLC v. State of NJ

Precedential or Non-Precedential: Precedential

Docket No. 03-2773

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Hi Tech Trans LLC v. State of NJ" (2004). *2004 Decisions.* Paper 290.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/290

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos: 03-2773/2849

HI TECH TRANS, LLC; DAVID
STOLLER,

Appellants

v.

STATE OF NEW JERSEY,
DEPARTMENT OF
ENVIRONMENTAL PROTECTION;
WOLFGANG SKACEL, C.H.M.M.*;
BRADLEY M. CAMPBELL*

*(Amended in accordance with Clerk's
Order dated 7/22/03)

Appeal from the United States District
Court
for the District of New Jersey
(D.C. Civil No. 03-cv-02751)
District Judge: Hon. Faith S. Hochberg

Before: McKEE and SMITH, *Circuit
Judges*, and

SCHILLER, *District Judge**

Argued: September 19, 2003

(Filed: September 2, 2004)

ANDREW L. INDECK, ESQ. (Argued)
Scarinci & Hollenbeck, LLC
1100 Valley Brook Avenue
Lyndhurst, NJ 07071
*Attorneys for Appellants*

PETER C. HARVEY, ESQ.
Attorney General of New Jersey
ANDREA M. SILKOWITZ, ESQ.
Assistant Attorney General
JAMES H. MARTIN, ESQ. (Argued)
Deputy Attorney General
R. J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, NJ 08625
*Attorneys for Appellees*

OPINION

McKEE, *Circuit Judge*.

Hi Tech Trans, LLC, which operates a solid waste disposal facility in Newark, New Jersey, and its Chairman and Chief Executive Officer, David Stoller (hereinafter collectively referred to as "Hi

*Honorable Berle M. Schiller, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

Tech"), sought declaratory relief against an administrative enforcement proceeding the New Jersey Department of Environmental Protection ("NJDEP") brought against Hi Tech. Hi Tech claimed that certain permit and license requirements imposed on solid waste disposal facilities by the New Jersey Solid Waste Management Act ("SWMA"), N.J.S.A. 13:1E-1 to -207, and its implementing regulations[1] are preempted because its solid waste disposal facility involves transportation by railroad and is therefore subject to the exclusive jurisdiction of the Surface Transportation Board ("STB").[2] The district court did not directly address the merits of Hi Tech's preemption argument. Rather, the court invoked the doctrine of abstention under both *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *Younger v. Harris*, 401 U.S. 37 (1971), and dismissed the complaint. Hi Tech now appeals the dismissal of its declaratory action. Although our analysis differs from the analysis the district court relied upon, for the reasons the follow, we will affirm.[3]

---

[1] *See* N.J.A.C. 7:26-1.1 *et seq.*

[2] As we will discuss below, the STB is the federal agency having exclusive jurisdiction over rail transportation. *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transportation Board*, 252 F.3d 246, 250 n.1 (3d Cir. 2001).

[3] We may affirm for any reason supported by the record, even if the grounds we rely upon differ from the grounds the district court relied upon.

## I. BACKGROUND

### A. New Jersey's Regulatory Scheme

New Jersey has established a comprehensive statutory scheme for regulating solid waste disposal based upon a legislative determination that "disposal and utilization of solid waste is a matter of grave concern . . . and . . .that the health, safety and welfare of the people of [New Jersey] require efficient and reasonable solid waste collection and disposal service or efficient utilization of such waste." N.J.S.A. 13:1E-2(a).

The collection, transportation, transfer, processing and disposal of solid waste is regulated by the SWMA and corresponding regulations located at N.J.A.C. 7:26-1.1 *et seq.* The SWMA grants the NJDEP the authority to regulate all solid waste facilities and register all persons engaged in the collection or disposal of solid waste. N.J.S.A. 13:1E-2(b)(6), N.J.S.A. 13:1E-4(a). In its regulatory capacity, NJDEP can impose liability on any "person" who violates the SWMA or the solid waste regulations. N.J.S.A. 13:1E-9(b). Regulations define a "person" to include individuals, corporations and corporate officials. N.J.A.C. 7:26-1.4. "Solid Waste" is defined broadly to include waste material that is stored or deposited in a manner that "such material or any constituent thereof may enter the environment or be emitted into the air or discharged into ground or

---

*Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000).

surface waters." N.J.A.C. 7:26-1.6©), N.J.A.C. 7-26-2.13(g)(1)(iii). Hi Tech's OIRY facility is a "Solid waste facility" under the SWMA.[5] It also constitutes a "transfer station" under the SWMA.[6]

New Jersey's environmental regulatory scheme prohibits "construction or operation of a solid waste facility without first obtaining a Solid Waste Facility ("SWF") Permit unless exempted pursuant to N.J.A.C. 7:26-1.1, -1.7 or -1.8."[7] In addition to requiring a SWF,

New Jersey law states that no "person" may operate a solid waste disposal facility. . . without first obtaining a certificate of public convenience and necessity. N.J.S.A. 48:13A-6.[8] A person operating a solid waste facility in violation of that requirement is subject to fines ranging from $10,000 for a first offense, to not more than $50,000 for a third or subsequent offense. N.J.S.A. 48:13A-12(b).

**B. Hi Tech's Business**

---

[5]The statute defines a "solid waste facility" to include any site or building used for the "storage, collection, processing, transfer, transportation, separation, recycling, recovering or disposal" of solid waste material. N.J.A.C. 7-26-1.4.

[6] A "transfer station" is defined as "a solid waste facility at which solid waste is transferred from one solid waste vehicle to another solid waste vehicle, including a rail car, for transportation to an off-site solid waste facility, or a solid waste facility at which [certain kinds of] liquid waste (as defined at N.J.A.C. 7:26-2.13(h)) is received, stored, treated or transferred[]. . . ." N.J.A.C. 7:26-1.4.

[7] A "[s]olid waste facility permit" or a "SWF permit" is "a certificate of approved registration and engineering design approval for a nonhazardous solid waste facility. N.J.A.C. 7:26-1.4 The minimum mandatory penalty for operating a solid waste facility without a permit is $5,000,

N.J.A.C. 7:26-5.4(g)(2), and each day a violation continues constitutes a separate and distinct offense. N.J.S.A. 13:1E-9(e).

[8] N.J.S.A. 48:13A-6 provides in pertinent part:

No person shall engage, or be permitted to engage, in the business of solid waste collection or solid waste disposal unless found . . . to be qualified by experience, training or education to engage in such business, is able to furnish proof of financial responsibility, and unless that person holds a certificate of public convenience and necessity. . . .

In order to obtain that certificate, an applicant must disclose the names and addresses of all persons with a legal or beneficial interest in the applicant's business. N.J.A.C. 7:26H-1.8(a)(1). The applicant must also give appropriate information regarding his/her skill, experience or education and financial responsibility. N.J.A.C. 7-26H-1.8(a)(2)

3

Hi Tech's principal place of business is located at the Oak Island Rail Yard ("OIRY"), in Newark, New Jersey. David Stoller is Chairman and CEO of Hi Tech. In 1990, the Canadian Pacific Limited, now known as the Canadian Pacific Railroad ("CPR"), purchased the assets and "trackage rights" of the former Delaware and Hudson Railway Company.[9] Those assets included trackage rights into the OIRY.

On November 6, 2000, CPR and Hi Tech entered into a License Agreement whereby Hi Tech agreed to develop and operate a construction and demolition debris ("C&D") bulk waste loading facility at the OIRY.[10] Paragraph 4(a) of the License Agreement limits Hi Tech to using "the Premises only for the transfer of Waste Products from truck to railcars operated by CPR."

Hi Tech began operations at the facility (which it refers to as the "Transload Facility"), on September 17, 2001. Hi Tech's Transload Facility operates as follows: (1) trucks hauling C&D waste arrive at the facility; (2) the trucks discharge C&D into a hopper that Hi Tech provides at the facility; and (3) the C&D waste is then loaded directly into rail cars from the hoppers. C&D waste is neither stored nor processed at the facility. Once the rail cars have been filled, CPR transports them exclusively to out-of-state disposal facilities.

## C. The NJDEP Investigation at OIRY

On April 16, 2003, NJDEP investigators conducted a site visit at the Hi Tech facility at OIRY. While there, they saw solid waste origin/disposal

---

[9] "Trackage rights agreements are arrangements by which one railroad company allows another to use its railroad tracks. These agreements can take one of two different forms. The owner railroad may allow the tenant railroad to serve freight customers along the leased track or may limit the tenant railroad to use of the track from one point to another, withholding permission to serve customers along the route." *Illinois Commerce Comm. v Interstate Commerce Comm.*, 819 F. 2d 311, 313 (D.C. Cir., 1987).

[10]The Agreement provided in relevant part that:

> CPR desires to utilize a portion of the Railyard . . . for the transloading of non-hazardous construction and

> demolition debris ("C&D") and non-hazardous contaminated soils ("Soils"), and intermodal transloading of containerized sludges and solid waste ("Containerized Waste") (C&D, Soils and Containerized Waste are hereinafter collectively referred to as "Waste Products") . . . .

4

("O&D") forms[11] and weigh tickets taken in and generated for solid waste loads accepted that day. All loads were classified on the O&D forms as either ID # 13 or ID #13C. *See* note 11.

Records indicated that approximately 12 "roll-off vehicles" had delivered solid waste to the facility for transfer from Hi Tech's facility prior to the NJDEP's investigators' arrival on April 16, 2003.

Before Joseph Levy, Hi Tech's general manager, arrived at the facility, the investigators also observed 4 loaded gondola rail cars containing bulky waste materials such as plaster, lathe, treated painted wood, plastic bags, cardboard, drywall, and sheet metal. The investigators met with Levy and asked him to accompany them to observe the actual "tipping operation" and to answer questions regarding the operation.

Inbound roll-off trucks transporting

C&D (ID #13C) and bulky waste (ID #13) were thereafter observed entering the facility and proceeding to the inbound scale. The trucks went to the "east box"[12] to dump their loads of solid waste and thereafter a crane loaded the waste into a waiting open-top rail car. Loads were visually inspected prior to dumping, and the crane operator had a full view of what was being dumped out of the roll-off container.

After dumping and leaving the "east box" area, trucks crossed the railroad tracks and proceeded to "weigh out" at the outbound scale. There, drivers turned in O&D forms and signed off on scale tickets

---

[11] Solid waste facilities are required to maintain waste origin/disposal records for each load of waste received by waste type ID number. N.J.A.C. 7:26-2.13(g). "Type 13" is "Bulky waste: Large items of waste material, such as appliances and furniture." N.J.A.C. 7:26-2.13(g)(iii). "Type 13C" is "Construction and demolition waste: Waste building material and rubble resulting from construction, remodeling, repair, and demolition operations on houses, commercial buildings, pavements, and other structures." N.J.A.C. 7:26-2.13(g)(iv).

---

[12]The "east box" refers to a roofless dumping area with approximately 12' high metal sides observed to be active during the inspection. The "west box" is a dumping area which was not active during the inspection, although NJDEP investigators observed and photographed several cubic yards of demolition waste present in the west box. Both dumping areas are similarly constructed with an earthen/C&D ramp on which the grappler operates to load the deposited waste into adjacent gondola rail cars. Likewise, each dumping area has 1" steel plate bottom area onto which waste is deposited. A steel frame ramp with wooden slats was observed constructed at each dumping area to accommodate roll off trucks. A lower dumping area (at ground level) was observed at each dumping area to accommodate larger transfer trailers and the overflow traffic of roll off vehicles.

prior to leaving the site. During the several minutes that investigators observed this operation, they saw several roll-off containers from various commercial and non-commercial solid waste haulers dump loads into the east box before the crane loaded that waste into a waiting rail car. They also saw approximately 15 loads (approximately 375 cubic yards) of ID #13 or ID #13D solid waste tipped for transfer at the facility.

Based upon this investigation, the NJDEP determined that Hi Tech was operating a transfer station, and that OIRY was a "solid waste facility." As noted above, solid waste facilities require solid waste facility permits and NJDEP approval of engineering designs. Based upon observations during the site visit, the NJDEP issued an Administrative Order after determining that Hi Tech was operating the facility without the required permits, registration, or design approvals and that Hi Tech was therefore operating the facility in violation of N.J.A.C. 7:26-2.8(f). The Administrative Order also charged that Hi Tech was operating in violation of N.J.A.C. 7:26H-1.6(a) because it was engaging in the business of solid waste disposal without a Certificate of Public Convenience and Necessity.[13] No

[13] The Administrative Order also determined that David Stoller, as Chairman and CEO of Hi Tech, had actual responsibility for the operation of the illegal solid waste facility and could have prevented the violation but failed to do so. Accordingly, the Administrative Order

penalty was assessed, but Hi Tech and Stoller were ordered to cease solid waste operations within twenty days.

The Order was served upon Hi Tech and Stoller on May 28, 2003, with an effective date of June 17, 2003. As will be detailed later, Hi Tech and Stoller filed a complaint in the district court on June 6, 2003, seeking, a declaration that state regulation of the OIRY facility was preempted by federal law. However, as of June 16, 2003, the day the district court dismissed the complaint, Hi Tech and Stoller had not availed themselves of their right to request either an administrative hearing, a stay from the NJDEP, or any of the other relief afforded under New Jersey's Administrative Procedure Act.[14]

stated that Stoller was in violation of N.J.A.C. 7:26-2.8(f) (failure to obtain a SWF permit prior to constructing or operating a solid waste facility); and N.J.A.C. 7:26H-1.6(a) (failure to obtain a Certificate of Public Convenience and Necessity prior to engaging in the business of solid waste disposal).

[14] New Jersey's Administrative Procedure Act, N.J.S.A. 52:14B-1, sets forth the procedures to be followed in the initial adjudicatory phase of an administrative procedure wherein the NJDEP will exercise its quasi-judicial function to determine the allegations set forth in the administrative cease and desist order. A party may take an appeal as of right to the Superior Court of New Jersey, Appellate Division, for review of final

Instead, they waited until June 17, 2003, the day after the district court dismissed the complaint in this case, and then sought a hearing and stay from the NJDEP.

On June 30, 2003, Bradley Campbell, New Jersey's Commissioner of Environmental Protection, ordered "that the Office of Solid Waste Compliance and Enforcement shall forbear from seeking judicial enforcement of the cease and desist order for a period of 60 days, or until further order of the Department vacating or amending this order for emergency relief, to enable [Hi Tech and Stoller] to obtain appropriate administrative due process on an expedited basis pursuant to the Administrative Procedure Act."

As noted, on June 17, 2003, Hi Tech requested an administrative hearing to contest the administrative cease and desist order. Thereafter, the Acting Chief Administrative Law Judge of the State of New Jersey issued an Initial Decision in which he accepted Hi Tech's argument that it was involved in transportation by railroad and was, therefore, subject to the exclusive jurisdiction of the STB. *State of New Jersey, Department of Environmental Protection v. Hi Tech Trans, LLC*, OAL Docket No. ESW 05815-03 (N.J. Office of Administrative Law Aug. 13, 2003). The

NJDEP filed exceptions to that Initial Decision on August 25, 2003.

In his Final Decision, the Commissioner of Environmental Protection of the State of New Jersey reversed the ALJ's decision and held instead that Hi Tech's facility was not subject to the exclusive jurisdiction of the STB and that NJDEP's authority was therefore not preempted. Accordingly, Hi Tech was ordered to immediately cease and desist its operations at the OIRY. *State of New Jersey, Department of Environmental Protection v. Hi Tech Trans, LLC*, Final Decision, OAL Docket No. ESW 05815-03 (September 29, 2003).[15]

## II. DISTRICT COURT PROCEEDINGS

On June 6, 2003, Hi Tech filed the instant complaint against the NJDEP in United States District Court for the District of New Jersey. Hi Tech sought a declaration that state laws requiring solid waste transfer stations like the OIRY to obtain a solid waste facility permit and a

---

action of any state administrative agency or officer and for review of the validity of any rule promulgated by any state agency or officer. *See* N.J. Court Rule 2:2-3(a)(2).

[15] On June 11, 2004, the Appellate Division of the Superior Court of New Jersey affirmed the Final Decision. *State of New Jersey, Department of Environmental Protection* v. *Hi Tech Trans, LLC*, No. A-29-03T3, (N.J. Super. Ct. App. Div. June 11, 2004) (per curiam). Hi Tech has filed a Notice of Appeal and a Notice of Petition for Certification to Appeal the Appellate Division's decision to the Supreme Court of New Jersey.

7

certificate of public convenience and necessity, are preempted as applied to Hi Tech. Based upon its preemption argument, Hi Tech also sought appropriate equitable relief including a preliminary injunction barring NJDEP from enforcing provisions of state law relevant to NJDEP's purported regulatory authority over Hi Tech and its OIRY based upon Hi Tech's claim of preemption. The NJDEP responded by arguing that the district court should abstain, and that the court lacked jurisdiction pursuant to the Eleventh Amendment.[16] The district court agreed with Hi Tech's Eleventh Amendment argument and dismissed the complaint, but Hi Tech filed an amended compliant the same day naming two individual defendants in their official capacities: Bradley Campbell, Commissioner of NJDEP, and Wolfgang Skacel, Director of the Office of Solid & Hazardous Waste Compliance and Enforcement of the NJDEP. The amended complaint essentially repeated the allegations of the dismissed complaint. Hi Tech's entire basis for relief was its claim that its facility is subject to the exclusive "authority of the Surface Transportation Board . . . ." App., vol. II, at 30. Hi Tech thus requested a declaratory judgment affirming that its operations are "exempt from [New Jersey's] administrative permitting and licensing regulations[]" and

"that [New Jersey] can take no action to enforce [its] law against [Hi Tech] . . . unless that action has been authorized by the Surface Transportation Board." *Id*. at 31.

On June 20, 2003, the district court dismissed the amended complaint on grounds of *Burford* and *Younger* abstention, and this appeal followed.[17]

### III. JURISDICTION

Hi Tech contends that we have appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court's dismissal of its amended complaint pursuant to *Younger* and *Burford* abstention principles amounts to a denial of its request for preliminary injunctive relief. Although we do not agree that we have jurisdiction pursuant to § 1292(a)(1), we nevertheless have appellate jurisdiction.

A *Burford* abstention order is a final, appealable order under § 1291 because the district court dismisses the case and consigns it to the state system. *Riley v. Simmons*, 45 F.3d 764, 770-771 (3d Cir. 1995). At one time we suggested that a *Younger* abstention order deferring to state administrative proceedings may not be a final order if the state administrative proceeding cannot give the plaintiff all of the requested relief but

---

[16] The NJDEP also argued that Hi Tech failed to make the threshold showing required as a condition precedent to preliminary injunctive relief.

[17] Hi Tech does not contest the district court's holding that the Eleventh Amendment bars its suit against the NJDEP.

8

federal law can. *See Williams v. Red Bank Bd. of Ed.*, 662 F.2d 1008 (3d Cir. 1981), *overruled on other grounds as recognized in Schall v. Joyce*, 885 F.2d 101 (3d Cir. 1989). However, in *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 713 (1996), the Supreme Court concluded that abstention stay orders are appealable because they put the "litigants 'effectively out of court[.]' " The prevailing view now is "that for all of the abstention doctrines, a federal court's decision to abstain is immediately appealable, but its refusal to abstain is not appealable until there is a final judgment." Erwin Chemerinsky, *Federal Jurisdiction*, § 12.3 at 768.

## IV. CONTROLLING LEGAL PRINCIPLES.

Hi Tech claims that its solid waste disposal activities in the OIRY facility are subject to the exclusive jurisdiction of the Surface Transportation Board. According to Hi Tech, any state regulation of its operations at the OIRY facility is therefore preempted by federal law. In Hi Tech's view, since state law is preempted by the federal regulatory scheme enforced by the STB, the district court erred in abstaining, and should have instead granted the requested declaratory relief and issued a preliminary injunction. Before turning to the merits of Hi Tech's preemption argument, it will be helpful to first discuss the principles of preemption and abstention.

### A Preemption.

"The Supremacy Clause[18] allows Congress to preempt state legislation if it so intends." *Olde Discount Corp. v. Tupman*, 1 F.3d 202, 206 (3d Cir. 1993) (citation omitted). However, a "preemption analysis should be 'tempered by the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted.'" *Ford Motor Co. v. Insurance Commissioner of the Commonwealth of Pennsylvania*, 874 F.2d 926, 936 (3d Cir. 1989) (citing *Merrill Lynch v. Ware*, 414 U.S. 117, 127 (1973)).

> The Supreme Court has recognized three general ways in which federal law may preempt, and thereby displace, state law: (1) 'express preemption,' which arises when there is an explicit statutory command that state law be displaced; (2) 'field preemption,' which arises when federal law so thoroughly occupies a legislative field as to make reasonable the inference the Congress left no room for the States to supplement it; and (3) 'conflict

---

[18]In relevant part, the Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuant thereof . . . shall be the supreme Law of the Land . . . ." U.S. Const. Art. VI cl.2.

preemption,' which arises when a state law makes it impossible to comply with both state and federal law or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*The St. Thomas – St. John Hotel and Tourism Assoc., Inc. v. Gov't of the United States Virgin Islands*, 218 F.3d 232, 237-8 (3d Cir. 2000) (citations and most internal quotations omitted). Since "[p]reemption is based on the Supremacy Clause of the United States Constitution, [it] does indeed raise a constitutional challenge which draws the abstention doctrine to the forefront of our consideration." *Zahl v. Harper*, 282 F.3d 204, 208 (3d Cir. 2002). .

## B. Abstention.

"Abstention is a judicially created doctrine under which a federal court will decline to exercise its jurisdiction so that a state court or agency will have the opportunity to decide the matters at issue." *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission*, 791 F.2d 1111, 1114 (3d Cir. 1986) (citation omitted). The doctrine is rooted in concerns for the maintenance of the federal system and "represents an extraordinary and narrow exception to the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.' " *Id*. (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Consequently, abstention is justified "only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Id*. (citation omitted). In other words, "[a]bstention from the exercise of federal jurisdiction is appropriate only under certain limited circumstances." *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 630 (3d Cir. 1991) (citation omitted). Those circumstances "are loosely gathered under discrete concepts of abstention named after leading Supreme Court Cases," *Chiropractic America v. LaVecchia*, 180 F.3d 99, 103 (3d Cir. 1999), *viz.*, *"Pullman"* (*Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496 (1941)); *"Burford"* (*Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)); *"Younger"* (*Younger v. Harris*, 401 U.S. 37 (1971)); and *"Colorado River"* (*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976)). As we noted at the outset, this appeal involves both *Burford* and *Younger* abstention.

### (1). *Burford* abstention.

"In *Burford*, the Supreme Court stated that a federal court should refuse to exercise its jurisdiction in a manner that would interfere with a state's efforts to regulate an area of law in which state interests predominate and in which

10

adequate and timely state review of the regulatory scheme is available." *Chiropractic America v. LaVecchia*, 180 F.3d at 104 (*citing Burford v. Sun Oil Co*., 319 U.S. at 332-334). The purpose of *Burford* is to "avoid federal intrusion into matters of local concern and which are within the special competence of local courts." *Id*. (citation omitted). The Supreme Court has "provided a clear definition of the *Burford* doctrine." *Chiropractic America*, 180 F.3d at 104. In *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans* ("*NOPSI*"), the Court wrote:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

491 U.S. 350, 361 (1989)(quoting *Colorado River Water Conservation District v. United States*, 424 U.S. at 814). *Burford* abstention therefore "calls for a two-step analysis." *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995)(citing *New Orleans Publ. Serv. Inc.*, at 361). "The first question is whether timely and adequate state law review is available." *Id*. (citation omitted). "Only if a district court determines that such review is available, should it turn to other issues and determine if the case before it involves difficult questions of state law impacting on the state's public policy or whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Id*.

The second prong of the *Burford* doctrine, as refined in *NOPSI*, requires a court to examine three issues: "(1) whether the particular regulatory scheme involves a matter of substantial public concern; (2) whether it is the sort of complex technical regulatory scheme to which the *Burford* abstention doctrine usually is applied; and (3) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Chiropractic America*, 180 F.3d at 105.

### (2). *Younger* abstention.

*Younger* abstention is similar in that it "espouse[s] a strong federal policy against federal court interference with pending state judicial proceedings absent

11

extraordinary circumstances." *Middlesex County Ethics Commission v. Garden State Bar Assoc.*, 457 U.S. 423, 431 (1982). "The policies underlying *Younger* abstention have been frequently reiterated" by the Court. *Id.* "The notion of comity includes a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate way,." *id.,* (citations and internal quotation marks omitted), as long as they can do so without contravening the supremacy of federal law. "Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard constitutional rights." *Id.* (emphasis in original).

In *Younger*, the district court enjoined the Los Angeles County District Attorney from prosecuting the defendant under a constitutionally-suspect state statute. The Supreme Court reversed, finding that the district court's injunction was "a violation of the national policy forbidding federal courts [from] stay[ing] or enjoin[ing] pending state court proceedings except under special circumstances." 401 U.S. 37, 41. "Although *Younger* involved a state court criminal proceeding, the national policy against enjoining pending state court proceedings has since been extended to noncriminal judicial proceedings." *Zahl,* 282 F.3d at 208 (citation omitted), including administrative proceedings.

The Court has set out a three-part test for determining whether *Younger* abstention is appropriate: "[a]bstention is appropriate when: (1) there is a pending state judicial proceeding; (2) the proceeding implicates important state interests; and (3) the state proceeding affords an adequate opportunity to raise constitutional challenges."

*Id.*, at 209 (citing *Garden State*, 457 U.S. at 432). "Even if this test is met, however, abstention is not appropriate if the plaintiff establishes that extraordinary circumstances exist such that deference to the state proceeding will present a significant and immediate potential for irreparable harm to the federal interests asserted." *Id.,* at 210 (citation, ellipses and internal quotation marks omitted).

## V. DISCUSSION

Hi Tech insists that the district court erred in abstaining in favor of the state regulatory process because the court was confronted with a preemption claim arising from its rail activity.

### A. Hi Tech's Preemption claim.

In 1995, Congress enacted the Interstate Commerce Commission Termination Act ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803 (1995) (codified as amended at various locations in 49 United States Code), which abolished the Interstate Commerce Commission ("ICC") and created the Surface Transportation Board, *Friends of the Altgen-Susquehanna Trail*, 252 F.2d at 250 n.1, an

independent agency within the Department of Transportation. *Commonwealth of Pennsylvania v. Surface Transportation Board*, 290 F.3d 522, 525 (3d Cir. 2002). The ICCTA provides that the STB "would perform all the functions that previously were performed by the ICC as of the effective date of the Act." *Id.* at 525 n.3 (citation omitted). Accordingly, the STB "perform[s] the core rail and trucking responsibilities formerly conducted by the ICC." Peter A. Pfohl, *Who Should Pay For Agency Adjudication? A Study of $200,000 Filing Fees at the Surface Transportation Board*, 25 Transp. L. J. 57, 59 (1997). Under the ICCTA, the STB has exclusive jurisdiction over "transportation by rail carrier" and its regulation of rail carriers preempts state regulation with respect to rail transportation. 49 U.S.C. § 10510(b).

The ICCTA defines a "rail carrier" as a "person providing common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5). There are formal procedures that must be followed to obtain the STB's authorization to act as a rail carrier. *See* 49 U.S.C. § 10910. This record establishes that Hi Tech has never received such formal certification from the STB. The district court notes that "on July 3, 2000, Hi Tech filed a Notice of Exemption in accordance with 49 C.F.R. § 1150.32 in an attempt to 'commence common carrier rail service over 641 miles of Canadian Pacific rail track, [but] Hi Tech withdrew its Notice of Exemption on July 17, 2000, and has never obtained status as a rail carrier." App., vol. I, at 10

n.7. Hi Tech has not offered anything to demonstrate that the court's conclusion that Hi Tech "never obtained status as a rail carrier" is erroneous. Indeed, in a related case, the district court held that Hi Tech is not a "rail carrier" within the meaning of the ICCTA. *Hi Tech Trans, LLC v. Hudson County Improvement Authority*, No. 02-3781, slip op. at 2-3 (D.N.J. Apr. 2, 2003). Given the nature of its loading activities, that holding is not surprising.

Hi Tech nevertheless claims that it is subject to the exclusive jurisdiction of the STB because its facility falls under the ICCTA's definitions of "transportation" and "railroad." In Hi Tech's view, because it falls under both definitions, its facility is subject to the STB's exclusive jurisdiction and, therefore, New Jersey's SWMA and its implementing regulations are preempted as applied to it. It submits:

> Hi Tech operates a "railroad" insofar as it operates intermodal equipment used by or in connection with a railroad and operates a terminal facility and yard and ground used for transportation. Hi Tech provides "transportation" insofar as it provides a yard, property, facility and equipment related to the movement of property by rail and services relating to that movement. When taken together, Hi Tech's facility and activity

fall directly within the definitions set forth in the ICCTA and the regulations thereof by state and local authorities is expressly preempted. Thus, the STB, by virtue of its exclusive jurisdiction over transportation by rail carriers, has exclusive jurisdiction over Hi Tech and its regulation preempts state law.

Hi Tech's Br. at 18-19.

## B. The Relationship Between Abstention and Preemption Here.

We are, of course, mindful that there is no absolute rule prohibiting abstention whenever a preemption claim is asserted. *See, e.g., Ford Motor Co.*, 874 F.2d at 934; *Kentucy West Virginia Gas Co.*, 791 F.2d at 1117. In *NOPSI*, the Court stated, "[I]t is clear that the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction." 491 U.S. at 365. That statement was, however, not part of the holding in *NOPSI* as the Court relied on the fact that the state proceeding at issue there was not the kind of proceeding that can trigger abstention under *Younger. See*, *id.*, at 367. Nevertheless, this *dicta* in *NOPSI* has often guided courts in deciding whether to abstain from resolving issues of preemption. For example, in *Olde Discount Corp.*, we stated "a claim of federal preemption, in and of itself, is not entitled to more deferential treatment than other constitutional claims in the face of an abstention challenge." 1 F.3d at 214.

There, the district court enjoined the Delaware Securities Commissioner from seeking recission on behalf of investors who had signed an arbitration agreement before the dispute arose. We had to address a question of preemption as Olde Discount argued that the congressional policy favoring arbitration underlying the Federal Arbitration Act ("FAA") preempted the Commissioner's right of recission under Delaware Law. The case therefore presented "a novel question of the relationship between a contracting party's right to enforcement of an arbitration agreement under the [FAA] and a state's interest in pursuing a remedy of rescission in an administrative proceeding." 1 F.3d at 204. We affirmed the district court's injunction and rejected Olde Discount's contention that the district court should have abstained in favor of the proceedings in state court. In doing so, we focused on the centrality of the preemption claim stating, "[i]ndeed, the circumstances presented make clear that a nonfrivolous claim of FAA preemption of a state remedy necessarily presents an exception to the *Younger* doctrine." *Id.*, at 211. We reasoned that "abstention in this case would be difficult to justify in light of the congressional intent reflected in [the FAA]." *Id.*, at 21.

Thereafter, in resolving the tension between preemption and abstention in *Chiropractic America*, we stated, "[o]ur focus should not be on *whether* a federal claim has been presented, but rather on the *nature* of that claim." 180 F.3d at 108 (emphasis in original). We added that "[c]ourts have held almost uniformly, for example, that abstention is inappropriate when a federal plaintiff asserts a preemption/Supremacy Clause claim." *Id.*; *see also Kentucky West Virginia Gas Co.*, 791 F.2d at 1115-16; *Hotel & Restaurant Employees & Bartenders Int'l Local 54 v. Danziger*, 709 F.2d 815, 832 (3d Cir. 1983), *vacated on other grounds*, 468 U.S. 491 (1984).

Similarly, in *Ford Motor Co.*, we addressed the propriety of abstention when balancing "the federal scheme designed to assist the nation's failing savings and loan companies and the important state interest in regulating the state insurance industry." 874 F.2d at 928. We there held that, given the pervasive federal regulation of banking, abstention in favor of state law was inappropriate. In doing so, we approvingly quoted the district court as follows: "' *dispositive* [of the issue] is a line of cases from the Courts of Appeals for the Third, Eighth, and Eleventh Circuits that hold that there can be no important state interests that the federal court should defer to in enforcing a state law that has been preempted by federal law.'" 874 F.2d at 988. (Emphasis added) (quoting *Ford Motor Co., v. Insurance Commissioner of Pennsylvania*, 672 F. Supp. 841, 849-50 (E.D. Pa. 1987)).

As *Olde Discount* and *Ford Motor Co.* illustrate, abstention is usually inappropriate in such a case because "Supremacy Clause claims are essentially ones of federal policy, so that the federal courts are particularly appropriate bodies for the application of preemption principles." *Chiropractic America*, 180 F.3d at 108. Moreover, where the federal interest is so strong that it preempts state law, there will rarely be a state interest sufficient to justify a federal court's decision to abstain from its "unflagging obligation" to exercise its jurisdiction. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

This follows because "[a]bstention is predicated solely upon the significance of the federal interest invoked." *Zahl*, 282 F.3d at 210 (citation and internal quotations omitted). Therefore, "[w]here 'Congress has created a statutory scheme . . . which arguably preempts the local regulation complained of, a fundamental element of *Burford* abstention is thrown into doubt, for we must question whether the case indeed involves *an essentially local issue*." *Kentucky West Va. Gas Co.*, 791 F.2d at 1116. Moreover, abstention under *Younger* can afford the Supremacy Clause no less priority.

Claims of federal preemption thus "require[] review of the state interest to be served by abstention, in tandem with the federal interest that is asserted to have usurped the state law." *Ford Motor Co.*, 874 F.2d at 934. The "notion of comity, so central to the abstention doctrine, is not

15

strained when a federal court cuts off state proceedings that encroach upon the federal domain." *Zahl*, 282 F.3d at 210 (citation and internal quotations omitted). Furthermore,

> [t]he determination of whether abstention is proper where preemption is alleged does not rest upon whether the preemption claim will ultimately prevail. Accordingly, just as the presence of a claim of preemption will not preclude abstention in every case, the decision that abstention is improper in light of a claim of preemption that has been asserted, need not result in the finding that the state statute has in fact been preempted.

*Ford Motor Co.*, 874 F.2d at 935 n.12.

Hi Tech's claim is bottomed upon, and limited to, its assertion that its operations at the OIRY facility implicate the STB's authority over railroads. Hi Tech contends that this is therefore a case of express preemption given the statutory definitions of "transportation" and "railroad" contained in the ICCTA. Since the Surface Transportation Board has exclusive jurisdiction over rail transportation, *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 250 n.1, Hi Tech insists that there is no local

interest justifying federal abstention.

As noted earlier, Hi Tech claims that it is subject to the exclusive jurisdiction of the STB even though it is not certified as a "railcarrier" because its facility falls under the ICCTA's definitions of "transportation" and "railroad.

> "[T]ransportation" is defined, under the ICCTA, *inter alia*, as a
>
> yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and . . . services related to that movement, including receipt, delivery, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property. . . ."

49 U.S.C. §§ 10102(9)(A), (B). Under the ICCTA, a "railroad" is, *inter alia*, "intermodal equipment used by or in connection with a railroad" and a "terminal facility, and a freight depot, yard, and ground, used or necessary for transportation." 49 U.S.C. §§ 10102(6)(A), (c).

Even if we assume *arguendo* that Hi Tech's facility falls within the statutory

16

definition of "transportation" and/or "railroad," the facility still satisfies only a part of the equation. The STB has exclusive jurisdiction over "*transportation by rail carrier.*" 49 U.S.C. § 10510(a), (b) (emphasis added). However, the most cursory analysis of Hi Tech's operations reveals that its facility does not involve "transportation by rail carrier." The most it involves is transportation "*to* rail carrier." Trucks bring C&D debris from construction sites to Hi Tech's facility where the debris is dumped into Hi Tech's hoppers. Hi Tech then "transloads," the C&D debris from its hoppers into rail cars owned and operated by CPR, the railroad. It is CPR that then *transports* the C&D debris "by rail" to out of state disposal facilities. As we noted above, Hi Tech operates its facility under a License Agreement with CPR. Pursuant to the terms of that license agreement, Hi Tech is permitted to use a portion of CPR's OIRY for transloading. Hi Tech is responsible for constructing and maintaining the facility and CPR disclaims any liability for Hi Tech's operations. License Agreement, ¶¶ 4(d), 7. Thus, the License Agreement essentially eliminates CPR's involvement in, and responsibility for, the operation of Hi Tech's facility. Hi Tech does not claim that there is any agency or employment relationship between it and CPR or that CPR sets or charges a fee to those who bring C&D debris to Hi Tech's transloading facility.[19]

Accordingly, it is clear that Hi Tech simply uses CPR's property to load C&D debris into/onto CPR's railcars. The mere fact that the CPR ultimately uses rail cars to transport the C&D debris Hi Tech loads does not morph Hi Tech's activities into "transportation by rail carrier." Indeed, if Hi Tech's reasoning is accepted, any nonrail carrier's operations would come under the exclusive jurisdiction of the STB if, at some point in a chain of distribution, it handles products that are eventually shipped by rail by a rail carrier. The district court could not accept the argument that Congress intended the exclusive jurisdiction of the STB to sweep that broadly, and neither can we.

However, as we noted at the outset, the district court stated that it was abstaining under *Burford* and *Younger*, and announced that it would therefore not decide Hi Tech's action for declaratory relief. Nevertheless, it is clear from its amended complaint that Hi Tech sought only a declaration that it is exempt from state regulations relating to its "intermodal rail operations." App., vol. II, at 194. Hi Tech included a request for "[s]uch other relief as this Court deems just and equitable." *Id*. at 194. However, that was clearly just an attempt to allow for a remedy if it prevailed on its preemption claim. It does not alter the fact that the

---

[19] We do not cite the License Agreement to suggest that a party can

contractually determine its status as a railroad carrier for regulatory purposes. Rather, we cite it merely because it further reflects the nature of Hi Tech's activities and its relationship to CPR.

17

only issue before the district court was whether New Jersey's environmental regulations were preempted because Hi Tech's facility is subject only to regulation by the STB. The district court responded to Hi Tech's request by concluding in relevant part:

> While the federal interest in regulating interstate railroads is indeed strong, the federal interest in this case is vitiated at least in part by the unprecedented claim of Hi Tech to be treated as a "railroad," when it is in fact a solid waste transfer station operating pursuant to a license from a railroad.

App., vol. I, at 10 n.7. The court held that since New Jersey's interest in regulating its solid waste disposal facilities is as real as it is critical, and since Hi Tech's claimed federal interest in regulating railroads was virtually non-existent given Hi Tech's business, Hi Tech's preemption claim was meritless. The district court explained:

> [b]alancing [Hi Tech's] rather attenuated federal interest against the interests of the State of New Jersey, there is a well-recognized compelling state interest in the DEP's enforcement of its own environmental laws especially as to the uniquely vexing problem of solid

waste facilities in a densely populated state that has suffered the scourge of unregulated solid waste facilities for decades.[20]

---

[20]On June 17, 2003, eleven days after Hi Tech filed its first complaint in the district court, Hi Tech filed a petition with the STB. It relied upon substantially the same preemption arguments we reject here and requested a declaratory order that its facility is therefore not subject to regulation by New Jersey's SWMA and its implementing regulations.

In a decision of the Director of the Office of Proceedings of the STB, dated August 14, 2003, Hi Tech's argument was rejected. *Hi Tech Trans, LLC – Petition for Declaratory Order*, 2003 WL 21952136, STB Finance Docket No. 34192 (Sub. -No. 1). After discussion and analysis, the STB concluded:

> In sum, Hi Tech's activities at its transloading facility at CP's Oak Island Yard and related activities are not part of "transportation by rail carrier" as defined under 49 U.S.C. § 10501(a). Hi Tech is merely using CP's property to transload cargo. Thus, the Board does not have jurisdiction over those activities, and section 10501(b) preemption does not apply to the state and local regulations at issue

*Id.* We agree. In fact, the district court's balance of the federal and state interests is as compelling as it is poignant. However, that's the jurisprudential "rub." For we are at a loss to understand why the court went

> here. Therefore, Hi Tech's petition to institute a declaratory order proceeding will be denied.

2003 WL 21952136 at *5.

For reasons best known to counsel for Hi Tech, Hi Tech never saw fit to inform us of the declaratory proceeding it instituted before the STB or the Board's decision. The NJDEP referred to it in its brief, at 14, but we did not learn about the Director's August 14, 2003, decision until counsel for the NJDEP sent a letter pursuant to F.R.A.P. 28(j) on August 27, 2003.

Hi Tech filed an appeal of the Director's decision, but on June 18, 2004, Hi Tech filed a letter with the STB withdrawing that appeal. Counsel for Hi Tech similarly did not see did not see fit to inform this court of its decision to withdraw its appeal, and we also learned of it only in a "28(j)" letter that counsel for NJDEP sent on July 19, 2004. We do not know why counsel for Hi Tech thought it appropriate to refrain from informing this court of matters so germane to this appeal, but we are certainly troubled by the level of professionalism and apparent lack of candor it reflects.

on to state in the very same paragraph of its Order: "upon balancing the state and federal interests in this case, . . . this Court will abstain from entertaining [Hi Tech's] Amended Complaint and will exercise its discretion not to grant the declaratory relief sought by Hi Tech." *Id.* As noted above, Hi Tech only asked the court to declare whether New Jersey's environmental regulations were preempted by federal law. Although the amended complaint also asked for "such other relief as [the] Court deems just and equitable," it is clear that the Court concluded as a matter of law that injunctive relief was neither just nor equitable because it correctly rejected Hi Tech's claim of a preempting federal interest. Thus, there was nothing left for the district court to abstain from.[21] The court gave Hi Tech all it asked for; a declaration of whether federal law preempted state environmental regulation of the OIRY. "Once a judgment disposing of all issues on which the parties sought a declaration is entered by a court," the matter is at an end. *Henglein v. Colt Industries Operating Corp.,* 260 F.3d 201, 210 (3d Cir. 2001).

---

[21] Indeed, even Judge Smith is forced to examine the strength of the federal interest here in explaining why abstention was proper. In his opinion, Judge Smith, agrees that the comparative weight of the federal interest here does not support a finding of preemption. Nevertheless, he concludes that the district court should have abstained even though, given the required preemption analysis, there was nothing left to abstain from.

Therefore, although the district court correctly dismissed the amended complaint, it did so for the wrong reason. It should not have relied on concepts of abstention; it didn't actually abstain. Rather, it should have dismissed the amended complaint because there was no basis for relief given Hi Tech's "untenable" and meritless preemption claim.

**CONCLUSION**

Accordingly, for the reasons set forth above, we will affirm the order of the district court insofar as it rejected Hi Tech's preemption claim and dismissed Hi Tech's amended complaint.

SMITH, *Circuit Judge*, concurring in the judgment:

I agree with the majority that the District Court should have dismissed Hi Tech's complaint. I disagree, however, with the majority's conclusion that the complaint should have been dismissed on the merits rather than on abstention grounds. In my view, the District Court properly abstained from reaching the merits of this case under *Younger v. Harris*, 401 U.S. 37 (1971).

The majority recognizes that this case satisfies the three-part test for abstention under the doctrine of *Younger*. *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432

(1982).[22] And the majority does not identify any "'extraordinary circumstances'" by which "'deference to the state proceeding will present a significant and immediate potential for irreparable harm to the federal interests asserted.'" *Zahl*, 282 F.3d at 209 (emphasis added) (quoting *Schall v. Joyce*,

---

[22] First, there was a pending administrative enforcement proceeding before the New Jersey Department of Environmental Protection, for which New Jersey law provides Hi Tech with a right to a hearing and a right to judicial review. N.J. Stat. Ann. §§ 52:14B-1 to 52:14B-24; *Zahl v. Harper*, 282 F.3d 204, 209 (3d Cir. 2002) (holding that similar proceedings under the New Jersey Administrative Procedure Act "are clearly judicial in nature, and therefore meet the first part of the [*Younger*] test"). Second, "there is a well-recognized compelling state interest in the [NJDEP's] enforcement of its own environmental laws especially as to the uniquely vexing problem of solid waste facilities in a densely populated state that has suffered the scourge of unregulated solid waste facilities for decades." Slip Op. at 30 (quoting App. at 10). Third, there was an adequate opportunity to address Hi Tech's preemption argument in the state proceedings. Indeed, preemption appears to have been the *only* issue raised in the state proceedings. What is more, the New Jersey ALJ ruled *in favor* of Hi Tech on its preemption argument. *NJDEP v. Hi Tech Trans, LLC*, OAL Dkt. No. ESW 05815-03 (N.J. Office of Administrative Law Aug. 13, 2003).

20

885 F.2d 101, 106 (3d Cir. 1989)); *accord Younger*, 401 U.S. at 53 (abstention may not be appropriate under "extraordinary circumstances" where "irreparable injury" would result).[23]

---

[23] In my view, the majority overstates the significance that the presence of a preemption claim should have on a federal court's decision whether to abstain under *Younger*. The Supreme Court has addressed this relationship in no uncertain terms:

> There is no greater federal interest in enforcing the supremacy of federal statutes than in enforcing
>
> the supremacy of explicit constitutional guarantees, and constitutional challenges to state action, no less than pre-emption-based challenges, call into question the legitimacy of the State's interest in its proceedings reviewing or enforcing that action. Yet it is clear that the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction.

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans ("NOPSI")*, 491 U.S. 350, 365 (1989). The majority characterizes this passage as *dicta*—a

Nevertheless, the majority concludes that the District Court should have resolved Hi Tech's declaratory judgment action on the merits, despite an ongoing state proceeding that was more than capable of addressing Hi Tech's

---

characterization with which I disagree and which is unnecessary to the majority's disposition of this case—and discusses opinions from this Court that either pre-date *NOPSI* or that involved abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), rather than *Younger*.

To be sure, cases involving preemption under the Supremacy Clause may present a significant and immediate threat of irreparable harm to federal interests such that abstention under *Younger* is inappropriate. *E.g., Olde Discount Corp. v. Tupman*, 1 F.3d 202, 212-13 (3d Cir. 1993) (*Younger* abstention not appropriate where state proceeding presented "an immediate potential for irreparable harm" to party's right to arbitration under Federal Arbitration Act). Were Hi Tech's claim "facially conclusive," for example, the threat of irreparable harm might be significant and immediate. *NOPSI*, 491 U.S. at 366 (suggesting that "[i]rreparable injury may possibly be established . . . by a showing that the challenged state statute is 'flagrantly and patently violative of express constitutional prohibitions.'" (quoting *Younger*, 401 U.S. at 53-54)). But that is certainly not the case here, as the majority concludes that Hi Tech's claims are without merit.

preemption claim. In my view, it is precisely this sort of "federal interference with pending state judicial proceedings" that *Younger* abstention is designed to avoid. Slip Op. at 19 (quoting *Garden State Bar Ass'n*, 457 U.S. at 431).

> "The notion of 'comity' includes 'a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.'"

Slip Op. at 19 (quoting *Garden State Bar Ass'n*, 457 U.S. at 431 (quoting *Younger*, 401 U.S. at 44)).

Although *Younger* involved an action to enjoin an ongoing state proceeding, the companion case of *Samuels v. Mackell*, 401 U.S. 66, 73-74 (1971), concluded that the same comity and federalism principles preclude federal courts from reaching the merits of a declaratory judgment action. *See Garden State Bar Ass'n*, 457 U.S. at 431 n.10. The majority today reaches precisely the opposite conclusion as that which I believe is required by *Samuels*. In *Samuels*, the district court dismissed the declaratory judgment action on the merits, holding that

the challenged state laws were constitutional. 401 U.S. at 67-68, 73. The Supreme Court "affirm[ed] the judgment dismissing the complaint, but solely on the ground that, in the appropriate exercise of the court's discretion, relief by way of declaratory judgment should have been denied without consideration of the merits." *Id.* at 73. Consistent with *Samuels*, the District Court in this case dismissed Hi Tech's complaint, declining to issue a judgment on the merits of Hi Tech's preemption claim despite the court's express doubts regarding the preemption issue. The majority affirms, but, contrary to *Samuels*, affirms on the ground that Hi Tech's complaint should have been dismissed on the merits. The majority reaches the correct result—affirmance of the District Court—but on grounds that, in my opinion, are contrary to Supreme Court precedent.

The difficulty in this case is that Hi Tech's preemption claim is translucently thin. Reading the majority's analysis of that claim, I have every confidence that their treatment of the preemption issue is correct. My confidence is bolstered by the fact that both the NJDEP and the Superior Court of New Jersey Appellate Division came to the same conclusion. *New Jersey v. Hi Tech Trans., LLC*, No. A-929-03T3 (N.J. Super. Ct. App. Div. June 11, 2004); *New Jersey v. Hi Tech Trans., LLC*, No. SWE PEA030001-U131 (NJDEP Sept. 29, 2003). In my view, however, these observations simply reinforce the basic premise of *Younger*: "Minimal respect for the state processes, of course, precludes

22

any *presumption* that the state courts will not safeguard federal constitutional rights." Slip Op. at 19 (quoting *Garden State Bar Ass'n*, 457 U.S. at 431).

The dispute in this case is a dispute between the NJDEP and Hi Tech, commenced in a state administrative tribunal with judicial review in the state courts. These proceedings were ongoing at the time Hi Tech filed its complaint in federal court, and there is no question that these proceedings were and continue to be capable of resolving the preemption issue raised by Hi Tech. Due regard for the state institutions involved in this dispute required the District Court to decline Hi Tech's invitation to consider a declaratory judgment that would obviate the substantial time and effort that New Jersey has expended on these matters. Because the majority's reasoning suggests the opposite, I am constrained to concur only in the judgment.